## W. E. Fondren v. The State.

### No. 2845.   Decided May 27, 1914.

Rehearing denied June 24, 1914.

**1.—Accomplice to Abortion—Indictment.**

Upon trial of defendant as an accomplice to abortion, it was not necessary that the indictment should allege that the principals knew that the female upon whom the abortion was performed was pregnant at the time said abortion was performed, and said indictment being in substantial compliance with the statute is sufficient.

**2.—Same—Statutes Construed.**

Article 1072, Penal Code, does not alone apply to the offense of accomplice to abortion, but article 79, Penal Code, prescribing who are accomplices to all offenses applies as well, and where the indictment was based on said latter article, the same was sufficient.

**3.—Same—Accomplices.**

At common law, there were accessories before and accessories after the fact, but, under our law, an accessory before the fact is an accomplice.

**4.—Same—Legislative Intent.**

It is impossible that the Legislature intended that one who advised, commanded, or encouraged another to commit abortion should be guiltless.

**5.—Same—Accomplice—Not an Offense in Itself.**

It has been expressly held by this court that the articles of our Code on accomplices prescribe no offense whatever, and that no crime is named or called accomplice.   Following Carlisle v. State, 31 Texas Crim. Rep., 537, and other cases.

**6.—Same—Statutes Construed—Pari Materia.**

Articles 79, 85 and 1072, Penal Code, being enacted at the same time in one Act in the adoption of our first Code in 1856, and containing precisely the same language in each and every other revision and adoption of our Code, unquestionably are what are denominated a statute or statutes enacted in pari materia, and must be so interpreted.

**7.—Same—Statutes Construed—Accomplice.**

The Legislature intended that one who advised, commanded or encouraged another to commit the offense of abortion is an accomplice thereto under article 79, Penal Code, and where the indictment so alleged, the same was sufficient, and the contention that no one can be an accomplice to abortion except one who furnishes the means for procuring the same, etc., as provided under article 1072, is untenable, as a person may be guilty of abortion under either article 79, or article 1072, Penal Code, according to the peculiar facts.   Davidson, Judge, dissenting.

**8.—Same—Statutes Construed—Rule Stated.**

Article 1072 is not in conflict with article 79, Penal Code, and as the statute expressly excepts manslaughter and negligent homicide from the application of article 79, Penal Code, by article 85, Penal Code, the rule *expressio unius est exclusio alterius* applies.   Davidson, Judge, dissenting.

**9.—Same—Jurisdiction.**

Where the defendant was indicted as an accomplice to abortion in the county where the same was committed, the jurisdiction was in said county,

and not in the county where defendant lived and advised said abortion. Following Carlisle v. State, 31 Texas Crim. Rep., 537, and other cases.

**10.—Same—Practice—Conduct of Jury.**

Where, upon trial of felony during the cross-examination of State's witness, one of the jurors said, "You have asked that question a hundred times," and there was nothing in the juror's conduct to indicate that he was unwilling to give defendant a fair trial, there was no error in overruling a motion to withdraw defendant's announcement and continue the case on account of said juror's conduct.

**11.—Same—Evidence—Husband and Wife—Cross-examination.**

Where, upon trial of an accomplice to abortion, defendant placed his wife on the witness stand, but asked her no question about the operation on her daughter for abortion, and State's counsel remarked, when taking the witness, that in as much as she had not been asked about the operation he could not cross-examine her on this point, to which remark the court sustained an objection, there was no reversible error.

**12.—Same—Evidence—Cross-examination—Husband and Wife.**

Where the cross-examination by the State of defendant's wife was with reference to matters brought out on direct examination, the same was proper.

**13.—Same—Reputation for Chastity—General Reputation.**

Where the defendant was charged as an accomplice to abortion upon his stepdaughter, and the latter gave material testimony for the State which was strongly attacked by the defendant, and testimony was introduced that she had had sexual intercourse with other men than defendant, there was no error in permitting the State to introduce testimony that her general reputation for chastity was good.

**14.—Same—Rule Stated.**

Where character or reputation for any given trait is attacked by showing specific acts, then the other side has the right to show the general reputation of the party in that respect. Following Bullock v. State, 73 Texas Crim. Rep., 419.

**15.—Same—Evidence—Supporting Testimony.**

Where, upon trial of an accomplice to abortion, the defendant contended that the whole matter was a "frame-up" on the part of his two stepdaughters and the husband of one of them, on account of hostility to him, and was permitted to prove threats and various hostile acts towards him, there was no error in permitting the State to show their connection with the facts pertaining to the abortion and defendant's connection therewith, and that they acted on the advice of others in communicating the matter to the officers and that their testimony was not a fabrication. Davidson, Judge, dissenting

**16.—Same—Evidence—Practice—Bill of Exceptions.**

Where, upon trial of an accomplice to abortion, State's counsel asked the sister of the female injured whether defendant undertook to treat her in the same way, etc., to which an objection was promptly sustained, there was no reversible error; besides, the bill of exceptions was defective.

**17.—Same—Argument of Counsel—Bill of Exceptions.**

In the absence of a bill of exceptions showing when the objection to argument of State's counsel was made, and the record showing that the court gave a special written charge withdrawing said argument, there was no reversible error; besides, said argument was proper.

**18.—Same—Accomplice—Charge of Court.**

Where the evidence did not raise the question of an accomplice as to a State's witness, and the court, nevertheless, charged thereon, there was no reversible error.

**19.—Same—Requested Charges.**

Where the special charges requested, which were proper, were given, and others, which were not proper, refused, there was no error.

**20.—Same—Accomplice—Female Injured Not an Accomplice.**

Where defendant was prosecuted as an accomplice to abortion, the female upon whom the abortion was performed is not an accomplice, and there was no error in the court's failure to charge that she was an accomplice. Following Watson v. State, 9 Texas Crim. App., 237, and other cases.

**21.—Same—Accessory—Charge of Court.**

Where, upon trial of an accomplice to abortion, there was no evidence raising the issue that the defendant was an accessory, the court correctly refused a charge thereon.

**22.—Same—Rule Stated—Accomplice—Principals.**

When one is on trial as an accomplice, the State must prove the guilt of the principal, and all evidence to establish this is admissible on the trial, and where the court properly admitted such evidence under proper instructions, there was no error.

**23.—Same—Sufficiency of the Evidence.**

Where, upon trial of an accomplice to abortion, the evidence, although conflicting, was sufficient to sustain the conviction, there was no reversible error. Davidson, Judge, dissenting.

**24.—Same—Evidence—Sustaining Testimony.**

Where defendant vigorously and viciously attacked the testimony of the State's witnesses and contended that the same was fabricated and rested on revenge and hatred and introduced testimony to this effect, there was no error in permitting the State to sustain the testimony of each of said witnesses by having them testify as to how the prosecution was brought about, and that their testimony was not a fabrication, and that they were advised by others to bring the prosecution. Davidson, Judge, dissenting.

Appeal from the District Court of Tarrant. Tried below before the Hon. Marvin H. Brown.

Appeal from a conviction of accomplice to abortion; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Hood & Shadle* and *Baskin, Dodge & Eastus* and *W. F. Ramsey* and *C. L. Black*, for appellant.—Cited cases in dissenting opinion.

*C. E. Lane*, Assistant Attorney General, and *James C. Wilson*, Assistant County Attorney, for the State.—Cited cases in majority opinion.

PRENDERGAST, Presiding Judge.—Appellant was convicted of accomplice to abortion on Daisy Moore and his punishment assessed at five years in the penitentiary,—the highest prescribed by law.

This is a companion case to that of W. A. Link, who was convicted as principal for procuring the abortion on said girl and affirmed by this court February 18, 1914, reported in 73 Texas Crim. Rep., 82, 164 S. W. Rep., 987. Some of the evidence in that case is quoted in the opinion. From it, the character of this case is shown. Daisy Moore

did not, in that case, testify as she did in this to what appellant said and did in the way of advising, commanding, encouraging, etc., the abortion so as to show him an accomplice thereto.  That evidence would not have been admissible in the Link case.  Appellant did not testify in the Link case.  He did in this.  Appellant's wife testified in the Link case fully what occurred and was said and done by her and by and between her and Dr. Link and others in the way of procuring and producing the abortion.  Appellant had his wife testify in this case, but did not have her testify anything about her seeing and trying to induce other doctors to produce the abortion, nor her seeing and what was said and done between her and Link, who with her actually produced the abortion; and, of course, the State could not and did not ask her anything thereabout.  We think it unnecessary to make any further detailed statement of this case, or the evidence.  As occasion arises, in passing on the different questions, we may make further statement of the evidence necessary or proper to show the questions, discuss and decide them.

In addition to the necessary preliminary and concluding allegations, the indictment is:

"That one W. A. Link and Rachael Fondren, in the County of Tarrant and State aforesaid, on the first day of May," . . . 1913, "did unlawfully make an assault in and upon the person of Daisy Moore, a pregnant woman, the said W. A. Link and Rachael Fondren then and there believing the said Daisy Moore to be pregnant at the time of said assault, and did then and there unlawfully, wilfully and designedly, and with the consent of the said Daisy Moore, and with the intent on the part of them, the said W. A. Link and Rachael Fondren, to procure an abortion on said Daisy Moore, thrust and force into the private parts and womb of the said Daisy Moore, a certain instrument, the name, character, description and substance of said instrument being to the grand jurors unknown, said instrument, in the manner so used, being then and there calculated to produce an abortion upon the said Daisy Moore, and by the said means aforesaid (and by other means to the grand jurors unknown), he, the said W. A. Link, and she, the said Rachael Fondren, did then and there procure an abortion upon the said Daisy Moore and did then and there, thereby, as aforesaid, destroy in the wor~h of the said Daisy Moore the life of a fetus or embryo which was then and there alive in the womb of the said Daisy Moore, . . . and the grand jurors aforesaid, upon their oaths aforesaid, do further present in and to the said court that one W. E. Fondren, in the County of Parker and the State of Texas, and before the commission of the said offense of abortion, as aforesaid, on the 30th day of April," . . . 1913, "did unlawfully and wilfully advise, command and encourage the said Rachael Fondren to do and commit the said offense of abortion, and did agree with the said Rachael Fondren that he, the said W. E. Fondren, would pay such sum of money as was necessary for the operation in procuring the said abortion upon the said Daisy Moore in Tarrant County, Texas, the said W. E. Fondren not then and there being present

in Tarrant County, Texas, at the time and place of the commission of said offense in Tarrant County, Texas. . . ."

Appellant made a motion to quash this indictmen. on only two grounds,—first, because it does not allege that said Link knew that Daisy Moore was pregnant at the time he is alleged to have thrust and forced into her private parts and womb the instrument described therein; second, because it "is misleading, confusing, contradictory, conflicting and repugnant in its allegations wherein it attempts to charge the means used" in these words: "Thrust and force into the private parts and womb of the said Daisy Moore a certain instrument, the name, character, description and substance of said instrument, being to the grand jurors unknown, said instrument, in the manner so used, being then and there calculated to produce an abortion upon the said Daisy Moore, by the means aforesaid, and by other means, to the grand jurors unknown, he, the said W. A. Link, and she, the said Rachael Fondren, did then and there procure an abortion upon the said Daisy Moore, etc."

After the trial and conviction, he made a motion in arrest of judgment on precisely the same grounds and no other. The court overruled both of these motions. He took bills to the overruling of each. In his motion for new trial he merely complains of the court's overruling each of these motions. In no other way, and on no other grounds, in the court below, or in this, did appellant attack the validity of the indictment.

Our statute (art. 1071, P. C.), prescribing what is abortion, says: "If any person shall designedly administer to a pregnant woman, or knowingly procure to be administered, with her consent, any drug or medicine, or shall use toward her any violence, or means whatever. externally or internally applied, and shall thereby procure an abortion, he shall be punished by confinement in the penitentiary not less than two nor more than five years; if it be done without her consent, the punishment shall be doubled.

"By the term 'abortion' is meant that the life of the fetus or embryo shall be destroyed in the woman's womb, or that a premature birth thereof be caused."

The statute as to accomplices (art. 79, P. C.) is: "An accomplice is one who is not present at the commission of an offense, but who, before the act is done, advises, commands or encourages another to commit the offense; or, who agrees with the principal offender to aid him in committing the offense, though he may not have given such aid; or, who promises any reward, favor or other inducement, or threatens any injury in order to procure the commission of the offense; or, who prepares arms or aid of any kind, prior to the commission of an offense, for the purpose of assisting the principal in the execution of same."

Article 85 is: "There may be accomplices to all offenses, except manslaughter and negligent homicide."

In addition, and as contradistinguished from principal, as to the offense of abortion: Article 1072, Penal Code, is: "Any person who

furnishes the means for procuring an abortion, knowing the purpose intended, is guilty as an accomplice."

We deem it unnecessary to discuss appellant's grounds attacking said indictment, for either a careful or casual reading of it and the statute shows that it substantially and fully alleges the offense in the terms of the statute which is all that is necessary. The statute does not require, and it was unnecessary for it to allege, that said Link *knew* Daisy Moore was pregnant when he forced the instrument into her private parts and womb. Wherein or how the indictment is misleading, confusing, contradictory, conflicting or repugnant, is in no way pointed out and neither is true. Appellant, in the brief of his able attorneys, cites no authorities, nor does he undertake by argument, illustration or otherwise to sustain his contentions and show that either of them are in any way correct.

The indictment, as shown on its face, was not drawn nor attempted to be drawn charging appellant as an accomplice under said article 1072, but was drawn and intended to be drawn, strictly under said article 79, based, of course, on article 1071, as to abortion.

Appellant in no way in this or the lower court, claimed that article 79, above quoted, prescribing who are accomplices to all offenses, did not apply and could not be applied to the offense of abortion. By making no such claim and attacking the indictment on the only grounds he did, he and his attorneys seem to concede that article 79 would and did apply. However, it is claimed in this case now that article 1072 alone applies to the offense of accomplice to abortion and that because of that article, article 79 is excluded and that an indictment for accomplice to abortion can not be based on article 79. A brief discussion and decision of this question is, therefore, proper.

At common law there were accessories *before* and accessories *after* the fact. Under our law accessory *before* the fact is an accomplice. In other words, we have no technical accessory *before* the fact denominated as such, but accessories *before* the fact are accomplices. Abortion was an offense at common law. In all our States abortion is an offense. Where there is no code so enacting then at common law, and in all others it is made an offense by statute, following the common law.

In 1 Standard Ency. of Proc., p. 126, it is said: "An accessory before the fact is one who, though absent at the time of the commission of a crime, procures, aids, counsels, or commands another to commit it."

In 1 A. & E. Ency. of Law (2nd ed.), p. 187 et seq., in treating the subject, "abortion," it is said, page 191: "In most of the States of the Union a woman who commits an abortion on herself is guilty of no crime, she being regarded rather as the victim than the perpetrator of the crime." That is our law, too. Said authority continues: "Under the statutes anyone who unlawfully or maliciously supplies or administers to a pregnant woman or causes or procures to be taken by her any drug, poison, substance, or noxious thing, or unlawfully uses or causes to be used any instrument or other means whatsoever, with intent to procure or cause an abortion, is a principal. Said authority

continuing (p. 192) says: "Any person who aids, abets or assists a woman or any other person to procure an abortion is an accessory or accomplice."

In 1 Ency. of Plead. & Prac., p. 66, it is said: "An accessory *before* the fact is he that, being absent at the time of the actual perpetration of the felony, procures, counsels, commands, incites or abets another to commit it." To the same effect is 1 Ency. of Law & Prac., pp. 252-253: "An accessory before the fact is one who counsels, commands or procures another to commit the crime, not being himself actively or constructively present at the time of its commission." To the same effect is every other text-book and authority on the subject.

Coming back now to our abortion statute, quoted above. By it, it is enacted that any person who shall use any external or internal violence towards a pregnant woman and thereby destroy in her womb the life of the fetus or embryo or cause a premature birth thereof, is guilty of abortion. All persons are principals who are guilty of acting together in the commission of an offense. (P. C., art. 74.) When an offense is actually committed by one or more persons, but others are present and, knowing the unlawful intent, aid by acts or encourage by words or gestures those actually engaged in the commission of the unlawful act, are principals. (P. C., art. 75.)

In morals, as in law, so held by all authorities, anyone who before a crime is committed, even though not present when committed, advises, commands, or encourages another to commit the crime, is just as criminal as he who actually commits it. As to the crime of abortion it is most usually, if not always the case, that the crime itself is committed by one person under the advice, command or encouragement of another. Is it possible that our Legislature intended that one who thus advised, commanded or encouraged another to commit abortion should be guiltless and not punished when every other State in this country holds such one criminal and punishes him? It is unthinkable that our Legislature so intended, and we would not be justified in so holding, unless such intention was so clearly expressed in the legislation as to practically exclude any other construction. Our codes and civil statutes require that they shall be liberally construed so as to attain the objects intended by the Legislature: "The prevention, suppression and punishment of crime." And that "in all interpretations the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy."

When our Penal Code was originally prepared, adopted and enacted in 1856, and in every revision thereof since then, it contained said articles 79, 85 and 1072, in exactly the same language as they now are. Of course, in the original code and each subdivision thereof since, some or all of them, may have had different numbers. So that, without doubt and without question, each of said articles were enacted at the same time originally, and each re-enacted in every revision since then, and are, in effect and in fact, the same Act by the same Legislature each time. Neither can there be any doubt or question but that the first ninety-one

articles of our code, as they are now numbered,—and they contain the same provisions as in every enactment and revision thereof, though some of them differently numbered,—were intended to apply and do apply to every offense therein and thereafter prescribed by the code, unless specifically excepted by one or more of them respectively, the same as if following each offense specifically. Especially is this true of articles 79 et seq. with reference to accomplice to offenses. It has been expressly held by this court that the articles of our code on accomplices prescribe no offense whatever and that no crime is named or called accomplice. Judge Hurt in Carlisle v. State, 31 Texas Crim. Rep., 537, said: "We have no definition of a crime named or called accomplice, but we are informed by our code what acts and things make a person doing them an accomplice to all felonies to which there can be an accomplice." Judge Henderson, in Moore v. State, 37 Texas Crim. Rep., 552, said: "It is a well settled rule of law that there can be no accomplice without a principal. . . . We can not have an offense that could be committed by an accomplice without a principal." In fact, our statutes themselves conclusively show this without any judge or court ever having said so. All offenses in our code are prescribed by the articles thereof subsequent to the first ninety-one articles. Our whole Penal Code was intended to be and is a complete law prescribing and denouncing every offense. As to offenses it is intended to be and is complete within itself up to the time of its enactment.

We do not intend and it is unnecessary, to call attention to all of the rules for the interpretation of statutes. We merely call attention to some of them which we think applicable to this question.

Said articles 79, 85 and 1072, being enacted at the same time in one Act in the adoption of our first code in 1856, and containing precisely the same language in each and every other revision and adoption of our code, unquestionably are what are denominated a statute or statutes enacted *in pari materia* and must be so interpreted.

Mr. Bishop, in his work on Statutory Crimes, 3rd ed., sec. 82, in grouping the rules for the interpretation of such statutes, says: "The statute should, if possible, be construed in a way to render each separate provision harmonious with its general intent. . . . The construction should be such as will not leave the entire enactment without effect. Nor should an interpretation be admitted, if avoidable, which will render one clause repugnant to another, but all should stand. . . . The court will endeavor to so shape the meaning of a statute that it can neither be eluded nor its purposes defeated. All its parts, and all acts, 'though made at different times or even expired' or repealed, and the entire system of laws, and the common law, touching the same matter, must be taken together; and, if one part standing by itself is obscure, it may be aided by another which is clear."

"When a statute is made in addition to another on the same subject, without repealing any part of it, both are to be considered together." (Sec. 86.)

Now, in order to determine what was the intent of the Legislature

and the effect of these respective articles on accomplice, we will restate them so far as they apply to this offense and to the indictment and evidence in this case.

An accomplice is one who is not present at the commission of an offense, but who before the act is done advises, commands, or encourages another to commit the offense. (Art. 79.) There may be accomplices to all offenses except manslaughter and negligent homicide. (Art. 85.) Any person who furnishes the means for procuring an abortion, knowing the purpose intended, is guilty as an accomplice. (Art. 1072.) Then what do we have? If the Legislature had intended by this law that no one who advised, commanded or encouraged another to commit the offense of abortion was not included by article 79, it would unquestionably have excepted that offense from that article, for in article 85 it did except manslaughter and negligent homicide. Instead of so intending it not only intended that any person who advised, commanded, or encouraged another to commit that offense should be guilty as an accomplice, but that also, in addition, as stated by article 1072, any person who furnished the means for procuring an abortion, knowing the purpose intended, should be guilty as an accomplice. It was not intended and could not have been intended by the Legislature that only the person who furnished the means for procuring the abortion should be guilty as an accomplice and not he also, who advised, commanded, or encouraged another to commit the offense. Neither is said article 1072 in conflict with the last subdivision of article 79 which provides that he is an accomplice who prepares arms, or aid of any kind prior to the commission of an offense for the purpose of assisting the principal in the execution of the same, but instead, is an enlargement, and intended to be so, of the latter part of said article 79. If the rule, *expressio unius est exclusio alterius,* applies at all as to this statute, it unquestionably is in favor of the construction we give to the several articles, instead of the reverse, for as the statute expressly excepts manslaughter and negligent homicide from the application of article 79, if the Legislature had intended to except abortion it unquestionably would have said so and included that in article 85. So that, as we see it, he who is an accomplice under article 1072 does not exclude, and can not be so held to exclude he who is also an accomplice under article 79. This question seems never to have been contended for before in any case decided by this court, for there is no decision or discussion of this question in any case of this court that we have been able to find after a most diligent search.

Appellant made a motion to dismiss this case, claiming that Parker and not Tarrant County had jurisdiction thereof. This has been expressly and repeatedly held against him. Carlisle v. State, 31 Texas Crim. Rep., 537; Dent v. State, 43 Texas Crim. Rep., 126; Sikes v. State, 28 S. W. Rep., 688.

During the trial, while the prosecuting witness, Daisy Moore, was on the stand and had testified on direct examination and was being crossed by appellant, one of the jurors said, "You have asked that question a

hundred times." The defendant's attorney stated, "I will endeavor to make it clear," and the juror replied, "It is plain enough for me." Thereupon appellant made a motion requesting permission to withdraw his announcement of ready for trial and continue the case, because, he claimed, said action and language by the juror showed such prejudice against appellant by him that he could not properly sit as a juror in the case. The court overruled appellant's motion and, in approving his bill, stated: "Counsel for the defendant had, upon cross-examination of the prosecuting witness, asked the witness over and over again to detail the exact places, dates and lapses of time between the same upon which her stepfather and author of her shame and disgrace had had sexual intercourse with her. The witness was hysterical and the repeated questions served to increase her suffering and hysteria. The court has no word of criticism because of counsel's manner of interrogating the witness, he acted only as any other might have done under such trying circumstances; but it was very apparent to the court that counsel's repeated grillings made the entire jury restless, and so much so, that watching them closely the court became aware of the fact that the jury had tired of the reiteration and the manifest suffering brought upon the witness by being forced to repeat and go into details relative to the acts of sexual intercourse between her and her stepfather that resulted in her downfall. There was nothing the court could do without risking the effect or probable effect upon the jury by stopping counsel. This occurrence and the discussion by counsel for defendant relative to whether the jury could hear and understand the witness brought forth the statement from the juror to which the bill is addressed. The court saw nothing in the juror's manner to indicate that the juror was inflamed, excited or unwilling to give the defendant a fair trial. It was such as would arouse the natural indignation of any decent citizen, and the State had made out a prima facie case." This shows no error.

Appellant introduced his wife, who testified in his behalf. He asked her no questions and she testified nothing about the operation on her daughter Daisy which produced an abortion. When appellant's attorneys got through with her direct examination, she was turned over to the State to cross. The county attorney stated to her: "They have not questioned you anything about this operation, and for that reason we will not do it—is the reason we can not do it." The appellant objected to this remark of the county attorney and requested the court to instruct the jury to disregard it. The court promptly did so, telling the jury: "You will not consider for any purpose this preliminary statement made by Mr. Wilson of counsel for the State to the witness for any purpose whatever." We see no reason whatever why the county attorney could not or should not have made said statement to Mrs. Fondren. He merely stated what was the law applicable. Besides, the jury knew appellant had not brought out anything on that subject by Mrs. Fondren. It has uniformly been held by this court that the prosecuting attorneys may comment on the failure of a defendant to

produce his wife as a witness or upon any omissions in her testimony if she testifies. For some of the cases see section 61, Branch's Crim. Law.

While Mrs. Fondren, appellant's wife, was on the stand she testified all about appellant's arrest it seems for both this offense and for the offense of incest with his stepdaughter, said Daisy Moore. In his direct examination he also testified about the same matters. It was, therefore, no error for the county attorney to ask him in cross-examination about the same thing.

The prosecuting witness, Daisy Moore, appellant's stepdaughter, upon whom the abortion was produced, was, of course, a very material witness for the State and had testified fully in the case. She testified that appellant had repeatedly had sexual intercourse with her and had impregnated her and was the author of her condition when the abortion was performed upon her. She also testified that no other man, at any time, had had sexual intercourse with her than appellant. Appellant denied all this and in various ways attacked the girl's chastity, both in his own and other testimony. His wife testified that her daughter, Daisy, told her at the time she told her of her pregnancy that someone other than appellant was the cause thereof and that she had had sexual intercourse with several others. She and he also further testified and had other members of their family to testify of the girl's staying out with boys very late at night and thereby intended to attack, and did in all these matters attack, the girl's reputation for chastity. The girl denied that she so stated to her mother, but, on the contrary, swore that she told her mother that no other had had sexual intercourse with her, other than appellant, who was the author of her ruin. Under such circumstances there can be no question but that the State had the right to prove, not only by appellant himself, but by several others, as the State did, that her general reputation for chastity was good. It is true appellant introduced no witness who qualified and swore that her general reputation in this respect was bad. Unquestionably, however, the appellant contended, as this record shows, and introduced witnesses to show, and their testimony tended to show, that the girl, Daisy, was guilty of numerous illicit acts of intercourse with several other persons, and that her conduct,—being out with them late at night repeatedly,— tended to show such acts. There can be no more forcible way of attacking the virtue of a girl than by showing or attempting to show specific acts of sexual intercourse. It is much more effective than general reputation on the subject. The principles announced and held by this court in Bullock v. State, 73 Texas Crim. Rep., 419, 165 S. W. Rep., 196, and cases there cited, are that where character or reputation for any given trait is attacked by showing specific acts, then the other side has the right to show the general reputation of the party in that respect.

Said witness Daisy Moore had a married sister named Pansy Kirby, who with her husband, George Kirby, resided in Fort Worth. Appellant and his wife and family, including Daisy, lived in the country in Parker County. According to Daisy's testimony, after her condition of pregnancy became known to her mother, and when she was several

months advanced, appellant knowing all about it and knowing that he alone was the author of her condition, and after he ineffectually tried various medicines to produce an abortion, in her language, "after that would not bring it on he (appellant) said there could not anything be done only for me to come.to Fort Worth and be operated on," and her mother prepared to take her to Fort Worth for that purpose under the direction and advice of appellant. She further testified that her mother said to her just before going, "Your Pa says nothing can be done only to take you to Fort Worth, and I will have to take you to Fort Worth and he won't take you, and' I will have to take you to be operated on; it would be found out if he were to take you, and I will have to take you; that, my father said, was the only thing to be done, was to take me to Fort Worth and be operated on." She further shows that appellant did take her and her mother to Weatherford to take the train for Fort Worth for the operation, and she further testified that on the way from their home to.Weatherford, appellant said: "Rachael (Mrs. Fondren), go until you get the operation performed, just check on the Piester Bank for it, and I could not write the check, I do not know how much it will take, and I will pay for any amount it takes to get it done, and get it done as cheap as you can, of course, and I will pay for whatever it takes; John Wiggins will cash it, and sign it up and send it in and he will cash it." Both the Kirbys as well as Daisy were very important witnesses for the State and gave very material testimony against appellant tending to show and showing, with other testimony, his guilt. The appellant denied having any illicit intercourse with Daisy and denied any knowledge of her condition until after she had been operated on and an abortion produced on her, and he claimed that the whole of the testimony implicating him in the matter by Daisy Moore was false and a frame-up, and that that of Mr. and Mrs. Kirby was false and a frame-up, and that the Kirbys were directly responsible for the false testimony of Daisy against him and was because of their hostility to him. He then showed that some seven years before this Kirby had made several threats against him,—by one, that he would get even with appellant if it took him forty years. By another, that he would get even with him some time or another. By another, that he would fix the "God damn son-of-a-bitch (appellant) if it takes me a thousand years, and by God I will ·catch him napping." That the cause of this hostility, as he claimed, was appellant's opposition to Kirby marrying Daisy's sister Pansy, and that she and he had to run away in order to marry and that she separated from him later, appellant being much opposed to the marriage and to their reconciliation. Appellant himself specifically, in effect, testified that Daisy was put up by the Kirbys to swear the lies on him.

Under such circumstances the court permitted the Kirbys to show their connection with the facts pertaining to the abortion and appellant's connection therewith, and that they advised with Mrs. Kirby's grandfather, who lived at Weatherford, before they would even inform the officers anything about it and that they acted on their grandfather

and grandmother's advice in communicating it to the officers. And permitted the officers to show that they procured from Daisy, before she was in communication with the Kirbys, all the facts substantially as she testified on the stand. In other words, the court permitted the State to show by the various witnesses that appellant's contention that the whole testimony of Daisy and the Kirbys was not fabricated and that the Kirbys did not induce Daisy to swear as she did, and that they did not even communicate the facts to the officers until they had advised with their grandfather and grandmother, and then did so only upon their suggestion and their advice. Under the circumstances, in our opinion, all this testimony was admissible for the purposes for which it was admitted and the court, by his charge, properly restricted the consideration thereof by the jury to the proper legitimate purposes for which it was introduced.

Appellant has another bill by which it is shown that while Mrs. Pansy Kirby, a State's witness, was on the stand, under direct examination, she testified that she was George Kirby's wife; that her maiden name was Pansy Moore; that she was a sister of Daisy; that appellant was her stepfather. Then this occurred:

"Mr. Wilson (of counsel for the State): Q. State whether or not the defendant undertook to treat you in the same way while you were at home? Mr. Baskin (of counsel for defendant): We object to that upon the ground— The witness: A. Yes, sir. Mr. Baskin: —it is immaterial in this case, and highly prejudicial matter, and one calculated to prejudice the rights of the defendant. The court: I sustain the objection. Gentlemen of the jury, you will not consider the questions just propounded by Mr. Wilson, nor the witness' answer thereto, for any purpose whatever. Mr. Wilson: The only reason we could offer it would be to explain his staying with Pansy Moore, instead of his own daughter, after this occurred, learning, as he stated, that Pansy Moore was present down here and heard what happened between Mrs. Fondren and the doctor; that is the only connection it would have, there is some doubt about it. The court: Yes, sir. Mr. Baskin: We understand that the attorney admits there is some doubt about it, about that testimony, he had that in his mind. I believe it is a matter of such highly prejudicial character we will even reserve an exception as to the proceedings which you or I could not control. The court: All right. Mr. Baskin: Note our exception."

This is in substance the whole of the bill, except the winding up of it that the bill was allowed, approved, etc. The State objects to the consideration of this bill, claiming that it is wholly insufficient to authorize or permit this court to consider it. The State is correct in its contention. The State also, in this connection and regarding this bill, contends, and the record shows, that the witness Daisy Moore not only testified to appellant's repeatedly having sexual intercourse with her, but also that he whipped her on several occasions and also that later he was more partial to her than any of his, or his wife's children, making her presents of various articles of jewelry, clothing, etc. The State

contends that the jury could have as well understood that it was seeking to show by Pansy Kirby that appellant did, or did not treat her as he did Daisy as to whipping her and as to being partial to her and giving her presents of various articles. So that, in no event, as we see it, whether the bill is considered or not, even if it had been intended by the State to show that appellant had or had attempted to have sexual intercourse with Pansy, as he had with Daisy, does the bill show any reversible error. The court, as shown above, promptly, when the objection was made, sustained appellant's objection to the testimony and at his request pointedly instructed them not to consider the question or answer thereto for any purpose whatever. No such injury by this could have occurred to appellant as to justify the reversal of this case.

The only other bill appellant has is a complaint to a very brief statement in the county attorney's closing argument for the State. The bill does not show when the objection was made, nor does it show that the court did not at once stop the county attorney and reprimand him, but it does show that the court gave a special written charge, telling the jury that said argument by the county attorney was improper and could not be considered by them for any purpose. We think the argument complained of was a proper one under the circumstances of this case by the county attorney, but whether it was or not, no injury could or did occur to appellant because the jury were told not to consider it for any purpose.

We think the evidence does not show or tend to show that Mrs. Pansy Kirby was in any way an accomplice to the abortion produced on Daisy, but whether she was or not, the court gave appellant's specially requested charge on the subject submitting that question to the jury and telling them if she was an accomplice that she had to be corroborated as required by law and the charge. The court, having covered the matter in giving one of appellant's charges on the subject, it was unnecessary and improper to give any of his others on the same subject.

Appellant complains that some of his special charges should have been given. We have considered them all and in our opinion none of them should have been given. Wherever proper they were covered substantially by the court's charge. All of his charges that Daisy was an accomplice were correctly refused. She was not an accomplice. Watson v. State, 9 Texas Crim. App., 237; Willingham v. State, 33 Texas Crim. Rep., 99; Miller v. State, 37 Texas Crim. Rep., 575; Hunter v. State, 38 Texas Crim. Rep., 61. It is needless to cite other cases or authorities.

We think there was no evidence properly raising any issue that the appellant was an accessory. Under the statute (P. C., art. 87), he could not have been an accessory. So that appellant's charge on that subject was properly refused.

It is the settled law of this State that when anyone is on trial as an accomplice to a given offense, that the State must prove the guilt of the principal and that all evidence to establish that is admissible on the trial, the same as if the principal himself was on trial. Otherwise much

of such testimony could not be admitted on the trial of the accused when charged as an accomplice. In this case, there was much of such testimony admissible and admitted. It is always proper in such cases for the court, in his charge, to, in effect, tell the jury that such testimony was admissible for the purpose of showing the guilt of the principal and that such testimony could be considered for that purpose only and not to show appellant's guilt as an accomplice. In the trial of this case these well established principles of law were applicable and the court gave the correct and proper charge on the subject. Therefore, appellant's objection to the court's charge on that subject in this case is not well taken.

The record in this case is quite voluminous. We have read and studied it all diligently and carefully. The evidence on some of the material questions was conflicting. This was a question for the jury. There is no question but that the evidence is ample to show appellant's guilt and the jury believed it. The State's testimony shows a most horrible crime committed by appellant. His testimony and his side of it if believed by the jury would have justified his acquittal. Such being the case, the jury being the exclusive judges of the facts and the credibility of the witnesses, this court can not rightfully disturb the verdict. There is no reversible error presented and the judgment will, therefore, be affirmed.

*Affirmed.*

DAVIDSON, JUDGE (dissenting).—The indictment charges that W. A. Link and Rachael Fondren, believing Daisy Moore to be pregnant at the time of the assault did unlawfully, wilfully and designedly, and with the consent of Daisy Moore, and with the further intent to procure an abortion upon Daisy Moore, thrust and force into the private parts and womb of Daisy Moore a certain instrument, the name, character, description and substance of said instrument being to the grand jurors unknown, said instrument, in the manner so used, being then and there calculated to produce an abortion upon the said Daisy Moore, and by the means aforesaid, and by other means to the grand jurors unknown, he, the said W. A. Link, and she, the said Rachael Fondren, did then and there procure an abortion upon the said Daisy Moore, and did then and there, thereby, as aforesaid, destroy, in the womb of the said Daisy Moore, the life of the foetus and embryo which was then and there alive in the womb of Daisy Moore, and that appellant in Parker County prior to the commission of the offense, did unlawfully and wilfully advise, command, and encourage the said Rachael Fondren to do and commit the offense of abortion, and did agree with the said Rachael Fondren that he would pay such sum of money as was necessary for the operation in procuring said abortion upon Daisy Moore, in Tarrant County, Texas, the said W. E. Fondren not then and there being present in Tarrant County, Texas, at the time and place of the commission of the offense in Tarrant County, Texas.

So it will be seen that appellant was charged as set forth in the indict-

ment with being an accomplice to Rachael Fondren by agreeing with her to furnish the money to secure the services of someone in Tarrant County to produce an abortion upon Daisy Moore.

The uncontroverted facts show that appellant, a widower, married Rachael Moore, a widow. At the time of their marriage appellant had six children, and Rachael Moore, subsequently Rachael Fondren, had three. To them after their marriage were born five children. Daisy Moore, the prosecutrix, was something like seven or eight years of age at the time appellant married her mother. Without going into a detail of the State's testimony, it may be briefly stated as the theory of the prosecution that appellant had been having intercourse with Daisy Moore. At the time of the trial she was nineteen years of age. That this intercourse had been going on between them for several years, and as a result she became pregnant. Her testimony further indicates that with his consent and perhaps advice she and her mother went to Tarrant County for the purpose of getting rid of the unborn child. That he carried them to the railroad some ten or twelve miles distant from their home, where they took the train going to Fort Worth. After reaching Fort Worth they went to two doctors who declined to have anything to do with the matter, one of them at last directing them to Dr. Link, one of the alleged principals in the indictment. They went to see Dr. Link, and he finally agreed to and did perform the abortion. For his services Mrs. Rachael Fondren gave Link a check for $200, which was' subsequently paid by her husband, the appellant. Without going into detail, for the evidence is voluminous, this is the substance of the State's case. These matters were all denied by appellant and his wife as to appellant's connection with it. Appellant denied having intercourse with the girl, and Mrs. Fondren contradicts her daughter on all material questions with reference to appellant's relation to the girl. She denies the conversation between herself and her husband and Daisy Moore with reference to the trip to Fort Worth. Appellant denies having any connection with Daisy Moore, and he and all of the family, several of whom testified, tend to exclude such an idea. The only intimation it seems of Daisy Moore's condition to the family, so far as appellant's side of the case is concerned, arises from a conversation Daisy Moore had with her mother just before they went to Fort Worth, in which Daisy Moore told her mother that she had been ruined, and, in substance, that the child was dead and unpleasant odors were being emitted. In this connection it was shown that she had what the witnesses call fits, fainting spells. Her mother then carried her to Fort Worth to have her treated, appellant knowing nothing of these matters, according to her testimony and according to his testimony. She induced her husband to let her take Daisy Moore to Fort Worth. He objected on the ground that he could not spare both of them, that he needed someone to cook at home, but he finally yielded, took them to the depot, and sent them to Fort Worth. The theory on which she went to Fort Worth was to have her daughter treated for these fainting spells, or to ascertain what was the matter, and get medical treatment. She herself had been in-

formed by Daisy Moore of the condition, but appellant knew nothing of this. They were to return on Saturday. Appellant went to the depot for the purpose of conveying them home. Mrs. Fondren returned but Daisy did not. This led to a conversation between himself and his wife as to why Daisy did not return, and as to what was the matter with her, and Mrs. Fondren informed appellant that the doctor diagnosed the case as being retroversion of the womb and spinal trouble, and that it would take some time to cure her, and she left her under the treatment of a doctor and nurse. Among other things, she informed her husband that she had drawn a check for $200, at which he became rather indignant and told her the doctor had robbed her and he would not pay it, but she finally persuaded him into paying it, and he did order the check paid. It is also testified by Mrs. Fondren that her daughter at the time she informed her of her ruined condition also in answer to queries by her mother as to who was the author of same, said she did not know, that she had been having intercourse with several, and she could not tell who was the author of her pregnancy. This may be deemed a sufficient statement of the case without going into details.

The indictment charges appellant with being an accomplice in that he advised Mrs. Fondren and commanded her and encouraged her to commit the offense of abortion, saying he would pay such sum of money as was necessary in performing the operation. It does not charge him with having advised or encouraged Link, who performed the operation. The facts for the State only show he agreed to pay for services of someone to commit abortion. His wife was not to produce the abortion, but only to employ someone to do so. There are several very interesting questions raised, among others, motion to quash the indictment, motion in arrest of judgment, and quite a number of bills of exception, and several matters of more or less importance. Without going into the different grounds upon which it is contended the indictment is insufficient, and that there is no case made against appellant under the statute, I would state that I am of the opinion that the indictment does not charge an offense against appellant, nor does the testimony show a case. The offense of abortion is thus defined: "If any person shall designedly administer to a pregnant woman with her consent any drug or medicine, or shall use towards her any violence or any means whatever, externally or internally applied, and shall thereby procure an abortion, he shall be punished by confinement in the penitentiary not less than two nor more than five years. If it be done without her consent, the punishment shall be double." The statute with reference to relation of accomplice to the crime of abortion thus defines it: "Any person who furnishes the means for procuring an abortion, knowing the purpose intended, is guilty as an accomplice." It will be noticed that that portion of the indictment which charges appellant with being an accomplice *does not charge appellant with knowingly furnishing any means* for procuring the abortion with *knowledge of the purpose intended*. It does charge that he wilfully advised, commanded and encouraged Rachael Fondren to secure an abortion, but does not charge that he knowingly

furnished the means for procuring it. As the statutory definition requires, first, that the accomplice shall furnish the means to procure the abortion, and, second, that he must know the purpose for which the means was intended, it will be necessary to charge the wording of the statute, otherwise the statutory offense would not be charged in the indictment. For this reason the indictment fails to charge an offense. But beyond this, taking the charging part as to appellant for all that it does charge, it does not allege an offense under the article quoted. Under this article in order to constitute appellant an accomplice he must furnish the means for procuring the abortion, and know the purpose intended when he furnishes the means. Going to the definition of abortion, we find that the "means" set out is any *drug or medicine,* or *violence,* or any *means* whatever *externally* or *internally applied which shall procure the abortion;* if the abortion is procured by these means, the offense is complete. But it will be noticed that nowhere in the indictment does it charge appellant with furnishing "any means" to produce an abortion. It is not alleged that he furnished "any drug or medicine," or that he furnished any "instrument" by which the abortion could be produced; nor does it charge that he furnished "any means" whatever to bring about an abortion. The only allegation is that he advised his wife and commanded and encouraged her to go into Tarrant county and secure someone to produce the abortion, agreeing to pay the incurred expenses. In order to constitute him an accomplice the indictment must charge that the accused furnished some "means," either a *drug, medicine* or *instrument* by which the *"violence"* was committed, or some "means" by which the abortion was brought about. In this particular case, under the facts the prosecutrix testifies that the abortion was brought about by inserting an instrument in her womb. This was the "means" used by Link under the State's view of the case. A casual inspection of the indictment shows that appellant was not charged with furnishing Mrs. Fondren or Dr. Link with the instrument used. If this statute means anything, in order to constitute a party an accomplice he must "furnish the means" for procuring the abortion, *"knowing"* at the time that the means furnished was to bring about an abortion. Under the definition of abortion, of course the "means" must be some of those set forth in the statute, such as *drugs, medicine* or some *violence* or *instrument,* or something of that sort, which applied to the woman direct produces the abortion. In this case appellant is not charged, nor does the proof show that he furnished any drug or medicine, or instrument or anything else by which this abortion was brought about, but all the evidence disproves such state of case. Our statute provides that there shall be no offenses in Texas except such as are provided by statutory enactment. The article of the code reads as follows: "In order that the system of penal laws in force in this State may be complete within itself, and that no system of foreign laws written or unwritten may be appealed to, it is declared that no person shall be punished for any act or omission unless the same is made a penal offense and a penalty is affixed thereto by the written law of this State."

The written law of this State is above quoted, that in order to constitute a party an accomplice he must furnish the "means" by which the abortion is brought about, knowing the purpose intended at the time he furnished the means, and as the Legislature has thus defined this offense, in the trial of cases, the courts must be governed by the definition given by the Legislature. The Legislature has not seen proper to extend the general doctrine of accomplices to this character of case, and it would seem that the general doctrine of abortion not only under the statute but everywhere is that there must be means furnished which, when applied, produces abortion. The simple advising and commanding and encouraging is not sufficient to constitute the accomplice. If appellant had been present at the time of the commission of the offense, and aided or encouraged Link in inserting the instrument or furnished him the instrument, we would have a different case, but there is no such charge as this in the indictment, and no proof to sustain it had there been such charge. He was not present, and the State's case is bound up in the proposition that he was in Parker County at the time the operation was performed in Tarrant County. It may be further stated here that the general doctrine as set forth in the statute does not apply to abortion, because the Legislature has seen proper to give a different definition to the term "accomplice" as applicable to cases of abortion. The general doctrine of accomplices found in the code is thus defined: "An accomplice is one who is not present at the commission of an offense but who before the act is done advises, commands or encourages another to do the offense or who agrees with the principal offender to aid him in committing the offense, though he may not have given such aid, or who promises any reward, favor or other inducement or threatens any injury in order to procure the commission of the offense, or who prepares arms or aid of any kind prior to the commission of an offense for the purpose of assisting the principal in the execution of the same." The latter clause of this general definition only seems to be in harmony somewhat with the definition of accomplice to abortion. That provides that the accomplice must *"furnish the means"* to commit the abortion, "knowing" it to be committed. The last clause of the general definition is he who prepares arms or aid of any kind prior to the commission of the offense for the purpose of assisting the principal in the execution of the same. In the absence of the specially enacted definition of accomplice to the crime of abortion, it could be possible and perhaps probable, that the general definition might be applied in cases of abortion, but the Legislature has seen proper to specially define who is an *accomplice to the crime of abortion,* and having so defined it, the courts will be bound by the definition given, and this under the rule that the inclusion of one excludes all other means, and in the crime of abortion the *accomplice must be brought within the statutory definition of furnishing the means knowingly for the purpose of bringing about the abortion,* and, of course, subsequently the abortion must be brought about. All offenses in Texas are statutory. We find also the code has this further provision: "In the construction of this code each general

provision shall be controlled by a special provision on the same subject if there be a conflict." The *general definition of accomplices* covers a much wider range of criminal matters than does the *special definition with reference to abortion,* and *there would be a conflict between the two to that extent* inasmuch as the Legislature saw proper to *confine the culpability of the accomplice to furnishing the means* by which the abortion' is committed. In looking at and construing an article defining *accomplice* to abortion, we find the Penal Code further provides that "every other law upon the subject of crime which may be enacted shall be construed according to the plain import of the language in which it is written, without regard to the distinction usually made between the construction of penal laws and laws upon other subjects, and no person shall be punished for an offense which is not made penal by the plain import of the words of a law." Applying that rule, we find that the "plain import" of the definition of "accomplice to abortion" confines the acts and the culpability of the accomplice to the *means furnished which brings about the abortion when applied.* We find another provision of our Penal Code in the following language: "Words which have their meaning specially defined shall be understood in that sense, though it be contrary to the usual meaning, and all words used in this code except where a word, term or phrase is specially defined, are to be taken and construed in the sense in which they are understood in common language, taking into consideration the context and subject matter relative to which they are employed." Applying that statutory rule to the definition of "accomplice" to the crime of abortion we find that the Legislature has confined it specially from this viewpoint to the acts of the party furnishing the *"means"* by which the abortion is brought about or consummated. These statutes have been so often construed I deem it not necessary to cite authorities. In the code we have *two definitions of accomplices,* both of which have been quoted; *one is the general definition,* and the other is the *definition specially confined to the crime of abortion.* It applies to no other crime. Then under these statutory prescribed rules of construction, the conclusion would seem to be irresistible that in the crime of abortion no one can be an *"accomplice"* except those who *furnish means* knowingly to bring about an abortion. Tested by these rules, this indictment does not charge an offense against appellant as an accomplice, nor do the facts prove a case against him. He furnished nothing in the way of drugs or medicines or instruments or anything at all. The only charge the State has made against the accused is that he commanded and advised his wife to have this abortion committed in Tarrant County, agreeing to pay the necessary expenses. The money he furnished would not bring about an abortion. It is not *"means"* by which an abortion can be brought about. This must be done by some of the "means" set forth in the statute such as medicine, drugs and violence and things of that sort that actually produced an abortion on the female. The word "means" used in the statute it has been held must be actually used or applied. It is not so much the intent, but it is the actual application of the means in cases of abortion.

This has been decided in a number of cases by this court. In Fretwell v. State, 43 Texas Crim. Rep., 501, on motion for rehearing, at pages 510-511, we find this language: "In the original opinion we held that the means used referred to the doses of the ergot as prescribed by appellant, and did not refer to the doses as actually taken by the prosecutrix. There was testimony in the record showing that if prosecutrix had taken the ergot within the three days as prescribed by appellant, that it was calculated to produce an abortion. None of them, however, testified that the medicine as taken was calculated to have that effect. She should have taken the medicine according to the prescription in three days, whereas she took it in small doses and consumed ten days in taking it; and as she actually took the medicine, none of the expert witnesses testify that it was calculated to produce an abortion. The statute does not seem to be predicated on the means prescribed, evidencing the intent of appellant, but on the means actually used; and this construction of the statute is borne out by the decisions of this court. Williams v. State, 19 S. W. Rep., 897; Cave v. State, 33 Texas Crim. Rep., 335. So, notwithstanding the doses prescribed may have been calculated to produce an abortion as testified by the physicians, yet the doses actually taken by the prosecutrix were not shown to have been calculated to produce an abortion. Appellant's guilt does not appear to be predicated on his intention, but on the actual appliance of the means prescribed. If this were not a correct interpretation, and appellant's guilt depended alone on his intent, he would be guilty if he made the prescription and delivered it to prosecutrix, although she may not have taken any of the ergot." Now applying the reasoning of this decision to the case here, appellant did nothing in the way of furnishing means and furnished no means by which an abortion could be brought about; he simply agreed with his wife and encouraged her, under the State's case, to go to Fort Worth to have an abortion performed, and to pay the expenses. She was not even to commit the abortion, but hire it done. None of this includes any of the statutory methods by which an abortion could be brought about. Make application of the decision just quoted and there is *nothing that would bring appellant within the rule as an accomplice to this crime.* Had he furnished the prosecutrix with the medicine for the purpose of bringing about an abortion and she committed the abortion on herself, he might have been a principal, but in that event not an accomplice. This was decided in Willingham v. State, 33 Texas Crim. Rep., 98. See also 1 Am. & Eng. Ency. of Law & Practice, pp. 118-119. In that case the doctrine was laid down where a party furnishes the means with intent to produce an abortion he is a principal and not an accomplice, though not present when the means was used by the female, and though the female was desirous of and consented to what was done to produce the abortion. It seems in that case Willingham furnished the woman the means by which the abortion was to be brought about. She would not be subject to a prosecution for a violation of the law by committing an abortion upon herself; she would be an innocent party under the statute, and this being true, the party furnishing the

means to the woman to bring about the abortion upon herself would be a principal. In order to constitute him an accomplice to the crime of abortion it would be necessary for him to furnish the means which produce the abortion, and this to some third party, that is, someone other than the woman herself, and that that party used it in bringing about the abortion. In 1 Am. & Eng. Ency. of Law and Practice, page 119, it is said: "The means struck at by the statutes are the unlawful supplying or administering to, prescribing for, or advising, or causing to be taken by a pregnant woman, any drug, poison, substance, or other thing—some statutes say noxious thing,—or unlawfully using or causing to be used any instrument or other means whatever, with intent to cause or procure an abortion." So from the standpoint of the general authorities the rule is the same as under our statute prescribed by the Legislature. This court is not authorized to create offenses, nor is it authorized by construction to prescribe the definition of offenses. That belongs to the legislative department. The statute prescribes that all offenses must be plainly defined by the Legislature. I see my brethren, however, refer to article 85 of the Penal Code, which says there can be no accomplice to the crime of manslaughter and negligent homicide, as sustaining their position that the accused in this case is brought within the general definition of accomplices and not within the specially defined term of accomplice as created by the Legislature. I do not understand how article 85 can sustain their view. Under that article there can be no accomplice to manslaughter or negligent homicide. The reading of that statute excludes all possibility of such a thing as an accomplice to either manslaughter or negligent homicide. Here the Legislature expressly defines what an accomplice is as it relates to the crime of abortion. The Legislature did not except accomplices out from the crime of abortion as it did in manslaughter and negligent homicide, but expressly enacted that where they brought themselves within the statutory rule that he would be guilty as an accomplice and not exempted from punishment.

My brethren invoke the rule of liberal construction prescribed in the Code of Criminal Procedure (White's Ann. C. C. P., art. 25). That statute does not apply to penal statutes prescribing punishment and defining offenses. I have already copied those from the Penal Code. The article relied on by them only pertains to practice and procedure and not the penal statutes.

There are, in my judgment, other questions which require a reversal of this judgment, but my brethren have seen proper to hold the other way, and it is doubtless useless to undertake a discussion of those as shown by the record. There is one question which I will mention without going into a discussion of it. There was quite a lot of so-called testimony introduced showing conversations and advisory counsel among themselves as between the sister of the prosecutrix, Pansy Kirby, and her husband, and his advice to her to go to her grandfather and grandmother's in Parker County and advise with them about this trouble, and subsequent conversations between these parties, all of which oc-

curred in the absence of appellant and could not, therefore, be binding upon him, and should not be held to affect his case adversely. There is also some evidence introduced as to conversations between the assistant county attorney and Pansy Kirby and others at the residence of Kirby, which I deem unnecessary to reiterate, but all bearing upon the same question as to why the witness Pansy Kirby brought about this prosecution, and explained why she had conversations with the county attorney, her grandfather, her grandmother, her husband and others. These matters were res inter alias acta and not binding on the defendant, and for which he was not responsible, and could not be. This testimony was evidently damaging, because appellant received a punishment of five years in the penitentiary, which is the highest prescribed for this offense. There might have been less ground for reversible error had he received the minimum punishment. Without going further into these matters or discussing them any more at length, I have been unable to agree with my brethren as to the sufficiency of the indictment to charge an offense against appellant, and that the evidence is sufficient to show that he was an accomplice to the crime of abortion such as is denounced by the statute. I am further of the opinion that the majority opinion has gone too far and has created an offense by construction not enacted by the Legislature. Taking the evidence in its strongest light for the State, it does not prove a case under the statute. I do not care to discuss these questions further.

For the reasons indicated I most respectfully enter my dissent.

### ON REHEARING.

#### June 24, 1914.

PRENDERGAST, PRESIDING JUDGE.—Appellant presents but one question on rehearing. He claims that the court below erred in admitting the testimony of Mrs. Kirby to the effect that before she laid the facts of this case before the prosecuting officers of Tarrant County, at the instance and direction of her husband, she laid the facts before her grandparents at Weatherford and that they advised her, upon her return to Fort Worth, in effect to lay the matter before the prosecuting officers, which she did. He also complains that the court below erred in permitting Mr. Wilson, the assistant county attorney of Tarrant County, in effect, to testify that before Daisy Moore, the prosecuting witness, had an opportunity to be corrupted, or came under the influence of Mr. and Mrs. Kirby she made a statement to him of the facts of this case, or what her testimony would be; and in permitting Mr. Wilson, the assistant county attorney, to also testify that Mrs. Kirby, on Sunday before the prosecution was instituted the next day, laid the facts of the case before him, and that the prosecuting officers instituted this prosecution and that neither of the prosecuting witnesses, Daisy Moore, nor the Kirbys, did so. And that he testified further that Mrs. Kirby, when he first saw her and she laid the facts before him, then told him

what she testified on this trial. And that this court, in the original opinion, erred in holding that the lower court committed no error in these respects. We have not undertaken to give above, in detail, appellant's contentions. We have merely stated the matter in a general way. In the following discussion we may state the matters more in detail.

Appellant by his able and eminent attorneys, in a very lengthy and vigorous brief, urges his contentions with great force, and has cited many cases and quoted from many of them. We have read and studied his brief and the authorities he cites, as we believe, thoroughly, and from his brief and authorities, and many others, which we have examined in connection with them, have reached the conclusion, which is entirely satisfactory to us, that the lower court did not err in admitting the testimony complained of and that this court reached the correct conclusion so holding in the original opinion.

With the view of discussing the questions we will restate the case and the evidence to some extent, in addition to what we did in the original opinion, but in connection therewith.

· As stated by appellant, Daisy Moore and Mrs. Kirby, her sister, and Mr. Kirby, were very material witnesses for the State. In fact, the State's case depended upon their testimony. If the jury should believe them it would result, as it did, in appellant's conviction. Knowing this, appellant, from the very first, began an attack specifically on these witnesses, and each of them, to show that their testimony was false, of · recent fabrication and was given by each of them corruptly at the instance of the Kirbys, and especially of Mr. Kirby, because of his intense hostility to appellant, his hatred of him and his oft repeated threats to revenge himself upon him. There is no question but that this record, and the bills themselves, show all this, and, in fact, his whole defense was based upon his said attack of said witnesses.

Mrs. Fondren was the daughter of Mr. and Mrs. J. R. Browning. Appellant was their nephew. Mr. and Mrs. Fondren were, therefore, cousins. She was a young widow and he a young widower when they married some years before this prosecution. At the time of their marriage Mrs. Fondren had some five children by her former husband, Moore. Pansy and Daisy were two of her daughters. Pansy was some two years older than Daisy and some seven years before this prosecution Pansy had married George Kirby. Likewise, appellant had several children when he married Mrs. Fondren. The two sets of children lived with their parents after their marriage. Mr. and Mrs. Fondren had several young children born to them after their marriage.

Daisy Moore testified that while she was a young girl, about nine or ten years of age, after her mother married Fondren, and when he could do so without being seen, Fondren began a course of treatment of her private parts with his finger and thus developed her private parts so that later he could effect an entrance with his private parts; that he kept up this course of treatment for about one year, then did secure an entrance of his private parts into hers; that he then kept up sexual intercourse with her from time to time until in October, 1912, when

he impregnated her and got her in family way; that after getting her in this fix he became very uneasy, and attempted, in various ways, by having her take drugs and he used things in her private parts to bring about an abortion. This failing, and her person beginning to show pregnancy, he, in effect, advised, encouraged, planned and commanded Mrs. Fondren to take her to Fort Worth to some doctor and have an abortion produced on her; that for this purpose he took her and her mother from their home some eight or ten miles from Weatherford, in Parker County, to Weatherford to send them by rail to Fort Worth to have the operation performed, telling his wife at the time to go till she had the operation performed and pay whatever was necessary to procure it; for her to draw the check on his local bank where he lived and of which he was an officer and he would have the check paid; that he could not himself in advance draw the check for he did not know what she would have to pay; that in obedience to his instructions and requirements her mother took her to Fort Worth and had Dr. Link, in connection with herself, to produce the abortion on her; that Mrs. Fondren, in payment, did draw a check on said bank in accordance with his instructions, for $200 and upon her return she so informed him; he protested that the amount was too large, that the doctor had robbed her, but gave instructions to the bank officer to pay the check, which was done.

Among other things, Daisy testified that just shortly before appellant had his wife take her to Fort Worth and have the abortion committed, she told her mother of her condition and that appellant was the author thereof and of her shame, and that she had frequently before then told her mother of appellant's treatment of her from the time she was quite a young girl. Appellant denied the girl's whole testimony along these lines, and protested his innocence.

He had his wife to testify and deny that Daisy had ever told her of appellant's mistreatment of her and that just a few days before she took her to Fort Worth that Daisy had told her that she had had frequent acts of intercourse with the young men with whom she went, and, in effect, that some one of them was the author of her shame and that appellant was not, and had never had anything to do with her.

Daisy and Mrs. Kirby both swore that when Mrs. Fondren, their mother, went to Dr. Link with Daisy and hired him to produce the abortion that she then, in their presence, told Link, in effect, that Daisy was pregnant by some boy in their community. Link first operated on Daisy on the evening of the last Tuesday in April, 1912. He and her mother then sent her to stay at Mrs. Chancelor's, a nurse. She was brought back by the nurse to the doctor, the next day, Wednesday, and he again operated on her. The nurse took her back to her house and that night she gave birth to the fetus. Mrs. Fondren saw her no more after Link performed the first operation on her until after this prosecution was begun. She returned home Wednesday. Appellant met her in Weatherford; she then told him about the check, and, as they claimed, nothing about an abortion, but that she had left Daisy at

Fort Worth to be treated by the doctor for some length of time for some other affliction. Appellant left his home, eight or ten miles from Weatherford, the next day, Thursday, took the train at Weatherford for Fort Worth, thirty-two miles by rail, went to the Kirbys and stayed all night. He claimed that he went to Fort Worth on this occasion to collect $2.50 on a note owed to him by someone living in Fort Worth! However, according to his own testimony, he promptly called upon Daisy at Mrs. Chancelor's the next morning. Daisy testified· that he so called upon her and he asked her, "Did it hurt much, Daisy?" She replied, "Yes, it liked to have killed me." He said, "Daisy, are you going to kiss me?" She replied, "No, I ain't going to kiss you," and did not. He said, "I am awful afraid people are going to find this out." He further said to her, "Daisy, I want you to go back as soon as you can and hurry up and get well." And that he then said to Mrs. Chancelor, "I want to take her away as soon as I can; I am awful afraid people are going to find out something if I do not move her away from here." And then, after Mrs. Chancelor left the room, he said to her, "Daisy, don't you give it away, now." And he also said something to her to the effect that it had cost him a whole lot.

Mrs. Kirby never saw Daisy from the time when her mother first made the arrangement with Link to perform the operation upon her until this Friday morning after Fondren had just visited Daisy, shown above. Mrs. Kirby said she met appellant on the streets in Fort Worth just after his visit to Daisy, and she testified: "I just met him and he said, 'Pansy, I have been over to see Daisy, and she is getting along fine; everything is all over with; it happened last night and she is getting along fine and I want to carry her home before Sunday, but I don't guess I can. I want to carry her back; I am afraid people will think something if she stays too long. She is getting along fine.' I replied to him, 'You are not going to take her back there, are you?' and he said, 'Yes, I am.' I replied, 'You are not,' and he said, 'That will never do, I will have to take her back,' and I said, 'You will not take her back and I will see you don't.' And he said, yes, he would take her back, and I told him, 'I will see you don't carry her back there,' and I said, 'You will not carry her back there and live with mamma and live with her and use her as you please and live with mamma too—that is a pretty come off there, living with them both and keeping her there and using her as you please,' and he said, 'That is none of your darned business,' and I told him, 'You are not going to carry her back there and have this happen again?' He said, 'It ain't none of your darned business how many times it happens, I paid for it, and it is nothing out of your pocket,' and he said, 'I have to catch that ten o'clock train.'" Daisy further testified that after he returned home on this occasion he telephoned to Mrs. Chancelor trying to make arrangements for her to send Daisy home right away.

The State in opening its case, introduced and had Daisy testify practically fully to make out the case. It then introduced only Mr. Brown-

ing to show the relationship of the parties, and to corroborate Daisy on that point, and Mr. Wiggins, the banker, to show that appellant gave him instructions to pay said check and that he paid it. The State did not introduce either Mr. or Mrs. Kirby in opening its case. They were introduced in rebuttal after appellant had introduced his witnesses attempting to establish his defense. When Daisy was turned over to him to cross he went into a most severe and extensive cross-examination, clearly thereby seeking to show that her testimony implicating him was utterly false; that it was of very recent fabrication; that it was induced and inspired by Kirby and his wife from their corrupt motive, hostility to and hatred of him, and their, or Mr. Kirby's, threats against him of vengeance. Among other things they had her testify that she went from Mrs. Chancelor's late Sunday evening after appellant had visited her the Friday before and had attempted to make arrangements with Mrs. Chancelor to ship her home the Saturday before, and that she had remained continuously since then at the Kirbys; that she wanted and intended to go home, but the Kirbys would not let her; they asked her if Mrs. Kirby had not talked to her a great deal about the evidence after she went to them. She admitted that Mrs. Kirby had talked to her, but told her at all times, "Tell the truth, Daisy, the whole truth; just tell the truth all the time." She was then asked if she did not know that Mrs. Kirby and her husband were very bitter against Fondren and that they didn't like him; and if Mrs. Kirby didn't run away at the time she married Kirby against the opposition of both Mr. and Mrs. Fondren; if she didn't know that Fondren and Kirby had very serious trouble at Fondren's home about the time Mr. and Mrs. Kirby married and when they at first separated. They had her testify that Fondren did not want them to go back together; that he talked around and talked to Mrs. Kirby to induce her not to live with Kirby; that they did separate and that Mrs. Kirby went back and stayed at Fondren's during their separation. He even had her testify that the Kirbys bought her a pair of red slippers while she was at their home just after this abortion; that when Fondren was arrested and brought to Fort Worth her mother went there with him and that her mother went out to the Kirbys where she was to induce her to return home with her, her mother telling her that if she did not go back with them, that she herself would have to go to jail, and that at first when her mother tried to get her to go back she refused, but when her mother told her if she did not go back with her that they would put her in jail, she then agreed to go back with them under the belief and representation by her mother that Fondren was then in jail; that when her mother first went out there that night she asked, "What have you told, girls; don't tell it; just stand by us, your pa will get you a new hat, Pansy; stand by us. Daisy, if you don't go back with me I will have to go to jail tonight; your pa is in jail, he is arrested and put in jail and I will have to go, too."

In addition, as soon as the appellant began to introduce his evidence, his main, if not his sole defense, as stated above, was an attack upon the Kirbys and Daisy. He didn't wait till the Kirbys or either of them

were introduced by the State and testified. His attack on them .was in advance. Appellant himself testified that he and his wife both objected to Pansy marrying Kirby; that they had to run away to do so; that after their marriage they separated; in a few months Pansy returned to their home, where she stayed a few months; that Kirby repeatedly sought a reconciliation with her, and the effect of his and Mrs. Fondren's testimony is, as well as Daisy's, that they opposed a reconciliation; and that at last, when Kirby did come to his house, seeking an interview with his wife for that purpose, he approached Mr. and Mrs. Fondren and told them the purpose of his visit—his wife was at the time in the field picking cotton; that appellant and his wife, in effect, first refused to let him see his wife, but finally did do so, appellant accompanying him at the time with a Winchester rifle to protect Pansy against him; that as soon as appellant had an interview with his wife, a reconciliation was at once brought about and he took her back, and they have continuously since then lived together as husband and wife and have had two children. He further testified that in the interview he had with Daisy on the Friday morning while she was at Mrs. Chancelor's, he, in effect, did not have the conversation and make the statements Daisy said he did. "I never heard that statement until it was made here yesterday and never did hear it until she made it here yesterday." That he and Kirby were not the best of friends at that time, and he specifically testified, "I kind of think Kirby put Daisy Moore up to swearing this lie on me. I kind of think she was put up to it." He further testified that on Monday when he was arrested and taken to Fort Worth, his wife accompanied him; that his wife, in effect, did not go to the courthouse with him when he made bond, but instead she went out to the Kirbys to get Daisy, and that when she met him to return home she told him Daisy was up there dressed and they (the Kirbys) would not let her come home; that Daisy was just bawling and crying and wanting to go home; that he told his wife, "We will go after her then," and that he got an automobile and he and his wife did go out to the Kirbys after her; that he told his wife, "We will bring her back"; that they went to the Kirbys in the automobile to get her and take her home, but that Kirby wouldn't let them take her. He denied that he stated to Kirby at this time, "George, let her come, I will help you." Kirby swore he did tell him that at that time.

In addition, he introduced Mr. Clark and had him testify that he knew Kirby and his wife at the time and before they married, and when they separated at one time; that he formerly lived near where appellant had lived and that he, the witness, was justice of the peace there and that about four years before this trial when he was at a blacksmith shop at Adell, he heard Kirby make this statement concerning appellant, "I heard him say that he would get even with Fondren about the trouble with his wife, if it took him forty years, and a good deal of talk along that line—that he would get even with him if it took forty years."

He also introduced Mr. Jordan and had him testify that in 1908, when

he was at George Kirby's home, he heard Kirby say that he (Fondren) had objected to him marrying his stepdaughter at the time; that he would get even with him some time or another.

He also introduced Mr. Mooney and had him swear that he knew Kirby and his wife Pansy and he remembered the occasion of their marriage; that he saw Kirby that day or soon after and heard him make this statement about appellant: "I will fix the God damn son-of-a-bitch if it takes me a thousand years, and, by God, I will catch him napping." The witness further said that he knew of his own knowledge that Fondren had objected to the marriage of the Kirbys and that they had some trouble about it; that Kirby was at the time pretty hot about the way the Fondrens had treated him.

So that it is clear and certain from this record that appellant's main defense was to break down the State's case made by Daisy Moore and the Kirbys, and that he vigorously and viciously attacked the testimony of each of these witnesses directly and positively, as utterly false, as recently fabricated, as inspired, induced, and brought about by the hatred and threat of revenge by the Kirbys against him, and that they themselves instigated and instituted this prosecution against him.

Under the circumstances we think there can be no doubt but that the State had the right and it was its duty to sustain the testimony of each of said witnesses in the manner and to the extent that it did to which appellant objects, and that the court committed no error in permitting this to be done.

In Jones v. State, 38 Texas Crim. Rep., 87, wherein Jones was prosecuted for murder for killing Veal, Jones' defense was that Veal had raped Mrs. Jones years before; that she had told Jones of this years after their marriage. This court, through Judge Davidson, in that case in a very able and exhaustive opinion, said:

"The statement of facts presents but one issue, and that is, whether appellant was guilty of murder in killing W. G. Veal, or whether he was guilty of manslaughter. If the jury believed the testimony of Mrs. Jones and appellant, the theory of appellant that it was nothing greater than manslaughter is clearly presented. If the jury did not believe the testimony of appellant and Mrs. Jones, then manslaughter, so far as the jury is concerned, is not in the case. The State's theory is that the killing was not prompted by a passion aroused by this misconduct of Veal towards Mrs. Jones (wife of appellant), and that her testimony was manufactured to aid her husband in his defense. Every particle of testimony introduced by the State is for the purpose of making a case in opposition to the truth of the testimony of Mrs. Jones and defendant. Now, the rule of law is that, where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, the party introducing the witness can prove that before the motive existed (the motive in this case being to save the life or liberty of her husband), the witness made the same statement as that sworn to. To state the proposition in another form: if the opposing case is to the

effect that the witness had a corrupt motive in swearing to certain facts, or that the witness recently fabricated the testimony for a purpose (in this case the motive being to prevent the conviction of appellant, and that, therefore, this testimony was manufactured after the death of Veal), the party introducing the witness (being the appellant in this case) can show that before the deceased (Veal) was killed the witness (Mrs. Jones) told the same story which she swears to upon the trial. By such proof, the charge that it was fabricated, or prompted by an improper motive, is completely met and destroyed, if believed by the jury. The authorities are divided as to whether a witness can be supported because the adversary has shown that he made conflicting statements about the fact. We hold that this can be done. This, however, is a doubtful question when tested by the authorities. All the authorities agree where the attack is made that the witness is prompted by improper motives, or has recently fabricated the story, that under either of these contingencies the party introducing his witness can prove his witness stated the same facts prior to the time when the motive could have existed, or prior to the occasion or circumstance prompting the manufacturing of the testimony. We have repeatedly written upon this subject, laying down substantially the same rules that we here state, and we deem it unnecessary to even cite the cases. In support of this last proposition we cite 1 Whart. on Ev., 2 ed., art. 570. We also call attention to the long list of cases cited by Mr. Wharton in note 2 to this article. Apply these principles to this case: When the testimony in the case had been concluded there was no evidence before the jury that Mrs. Jones or appellant had ever alluded to the outrages committed on Mrs. Jones. The inference is cogent indeed that it was fabricated to save the life or liberty of appellant. It would have been perfectly natural and reasonable for the jury to have inferred that she had manufactured her testimony because she wanted to save her husband. But suppose. in addition to her testimony (it being of a doubtful character standing alone), the evidence of Kendall had been received, would any man have entertained the same doubts about its truth as if her testimony had been without support? Law should be common sense, and there is no man but what would have much more readily believed her testimony if they had known that she told the same story before the death of Veal as that which she swears to on the trial. We are of opinion that this testimony was admissible for the purpose of supporting Mrs. Jones, and for the purpose of showing that Jones believed her statements. Again, in another view, this testimony was admissible as independent evidence, for the purpose of showing that the insulting conduct of Veal towards Mrs. Jones had been communicated to Jones prior to the homicide. It is true that Mrs. Jones swore directly that she communicated the insulting conduct of Veal to her husband, but the defendant was not circumscribed by making such proof by his wife. As original testimony, it was entirely competent for the defendant to have introduced Kendall to show that Mrs. Jones communicated the conduct of Veal to him, and that he in turn told it to the defendant prior to the homicide." This

was stated in the original opinion of the court herein when the case was reversed and remanded. The State came back in its motion for rehearing attacking most vigorously the opinion of the court on this point. The court again, through Judge Davidson, in an opinion on rehearing, took up the question and said:

"The Assistant Attorney General cites us to Mr. Wharton and authorities which deny the correctness of a proposition that a witness can be supported when thus attacked. We have written a number of opinions in which we called attention to the fact that Mr. Wharton and a great many cases question or deny the correctness of the proposition. We have not invented this rule for this case, but have applied it to every case in which the question has arisen. The original opinion was based upon this proposition, found in Mr. Wharton's work on Evidence (section 570, and the same action relied on by the Assistant Attorney General), and the rule is not questioned by any authority, towit: 'On the other hand, where the opposing case is that the witness testified under corrupt motives, or where the impeaching evidence goes to charge the witness with a recent fabrication of his testimony, it is but proper that such evidence should be rebutted. It has consequently been ruled that statements made by a witness corroborating his evidence upon the trial, such statements being uttered soon after the transaction in litigation, and at a time when the witness could not have been subject to any disturbing influences, are competent when proof has been offered to impeach him, by showing that he had recently fabricated the narrative, or that he testified corruptly.' In support of this proposition, Mr. Wharton cites a great number of authorities, common law as well as from the different States of this Union. And in the note to said text we find this: 'Russell (volume 3, page 593) holds that the better opinion seems to be that such evidence is not admissible, except in cases where the counsel on the other side impute a design to misrepresent, from some motive of interest or relationship.' And this note is supported by a great number of authorities, all of which are English cases, including as well Phillips, Starkie, and Hawkins. These excerpts from Mr. Wharton will be found in the very same section quoted and relied upon by the Assistant Attorney General. If we had based our ruling upon the fact that Mrs. Jones was supported, because proof had been made tending to show that she had made contradictory statements, the excerpt from Mr. Wharton contained in the motion of the Assistant Attorney General would have had some explanation. But, as before stated, the appellate courts of this State have held, in an unbroken line of decisions, that, where a witness is attacked by showing contradictory statements, the witness can be supported. We are not called upon to go back on that rule, for, as above stated, the opinion is not upon that subject. Now, will anyone deny but what the State's case—the opposing case—most powerfully suggests that Mrs. Jones had fabricated her testimony to save her husband's life? There was the motive, the cause assigned, and no doubt argued with great force and effect before the jury. To meet this appellant had the right to show that his wife did

not fabricate this testimony to save her husband; that she told the same story before the killing of Veal. For the first time in this State, so far as we know, the motion for rehearing in this case questions the rule, where when a witness is attacked by showing that he testified corruptly, or had recently fabricated his testimony for a purpose, he could be supported by proof that he (witness) made the same statements before the motive could have existed, and that it was not fabricated, because he had told the same story before. In this case the motive on the part of Mrs. Jones was to save the life of her husband, if her testimony was false. This was the opposing case of the State on the trial."

To the same effect is English v. State, 34 Texas Crim. Rep., 190, wherein Judge Hurt for the court said: "Appellant complains of testimony to the effect that the witness gave on the night of the homicide a similar version of the facts attending same as sworn to by him on the trial. Appellant, before this, had made an attack upon him, by trying to prove that his evidence was recently fabricated. Under this state of case the State had the right to sustain her witness by proving that just after the homicide her witness made the same statement in substance as that sworn to on the trial, and by this means disprove that his testimony was recently fabricated."

To the same effect Judge Hurt for the court, in Mitchell v. State, 36 Texas Crim. Rep., 278, said: "Before introducing him as a witness in this case a nolle prosequi was entered. Upon cross-examination appellant's counsel asked him if his case had not been nol prossed. He answered that it was. This question and answer were over the objection of appellant, the objection being that you could not thus support a witness. The law is with the action of the court below. Evidently, when the counsel for the appellant proved that the prosecution had been nol prossed as to Neal, the purpose was to impeach him by showing that that was the cause of his testifying as he did, and that his testimony was therefore corrupt, and perhaps induced by a bargain between him and the State. Under this State of case the party introducing him could show that he made the same statement before his case was dismissed. This is not an open question."

In Reddick v. State, 35 Texas Crim. Rep., 463, Judge Hart, for the court, said: "If the defendant attempts to show that improper influences have been brought to bear upon the prosecutrix, or any other witness, to accuse the defendant of the crime, the State would have the right to prove that, before these influences were applied, she told the same tale as she swears to now upon the trial."

In Akin v. State, 56 Texas Crim. Rep., 324, this court said: "If the State should claim and contend, as is here done, that the testimony of Mrs. Akin, as to deceased's insults to her, was a fabrication and pursues the same course of attack on her testimony as is here shown, we think it admissible for appellant to show, in corroboration of the testimony of his wife, that she had made, before the homicide, statements to her sister in keeping and harmony with the disclosures claimed to have been made by her to her husband. This doctrine, we think, is fully supported

by the decisions of this court in Jones v. State, 38 Texas Crim. Rep., 87, 40 S. W. Rep., 807, and State v. Buffington, 4 L. R. A. (N. S.), 154; see notes, page 164."

While quite lengthy, we will now copy what is shown by the bills of exceptions to the testimony complained of. The first shows this:

"Mr. Wilson (of counsel for the State): Q. When you got over there and told Mr. Browning what had happened, did he give you advice about the matter? A. Yes, sir. Mr. Shadle (of counsel for defendant): We object to that, about any advice he gave her up there about the matter; it is not binding upon the defendant and is wholly immaterial. Mr. Wilson: We think it is right for the State to show on whose advice she acted. Mr. Baskin (of counsel for defendant): We except; hearsay, and a matter that occurred outside of the presence of this defendant and he is not bound by it. Mr. Wilson: It is not offered as any evidence tending to connect the defendant with the commission of this crime. Mr. Baskin: We still object and except. . . . Q. When you reported this matter to him—I won't ask you in detail, but did you tell him what you had heard and seen over here? A. Tell grandpa? Q. Yes, ma'am. A. Yes, sir. Mr. Shadle: Our objection and exception goes to all of that. Mr. Wilson: Q. What did he advise you? A. He told me and my grandma both— Q. What did they advise you? A. They told me, 'You go back home, and in the morning you call up the prosecuting attorney's office,' and I did. . . . Q. Who did he say get? A. He said get Mr. Wilson, Jim Wilson, and he said, 'He is assistant prosecuting attorney there,' and I done that next morning like they told me to. And he said, 'You tell them all about what happened, tell them to come to your house, 1211 Gould Avenue, tell them everything when they get there.' Q. Did you know I lived over here then? A. No, sir, I did not know you lived in Fort Worth. Q. Did you ask—did you act on his advice in the matter? A. Yes, sir. Q. Did you phone me? A. Yes, sir. Q. Did you talk to anyone in the county attorney's office before you talked to me? A. I talked to Mr. Baskin (John Baskin, county attorney) at his house. Q. What did you ask him? A. I asked him your number. Mr. Baskin: Same objection. Mr. Wilson: We understand you are taking a bill to all this evidence? The court: Yes, sir, give you a bill to all of it. Mr. Baskin: Note our exception. Mr. Wilson: Did you phone? A. I could not find your number in the book and I called Mr. Baskin and he give me your number. Q. Did you phone me and talk to me? A. Yes, sir; I done like they told me, I told them, 'This is Pansy Kirby, J. R. Browning's granddaughter,' and told you I wanted you to come to my house, 1211 Gould Avenue. Q. Did you tell me what it was about? A. I told you I had some important news to tell you— I did not tell you what it was. Q. When I got there it was on Sunday? A. Yes, sir. Q. Did you tell me what you had testified to here? A. Yes, sir." The court qualified this bill as follows:

"With the explanation that the defendant had introduced testimony for the purpose of creating in the minds of the jurors the belief or sus-

picion that Mr. and Mrs. Kirby had put the prosecuting witness up to laying the blame for her downfall on the defendant, and the court permitted the testimony complained of to be introduced in order that the jury might see what connection the Kirbys had with the prosecution."

Appellant accepted this bill thus qualified and is bound thereby. The record unquestionably sustains the court's qualification.

The other bill shows this: That the assistant county attorney, Mr. Wilson, on the State's behalf, took the stand, when this occurred:

"Mr. John Baskin (county attorney): Q. Now, Mr. Wilson, the question these gentlemen put to Mr. Kirby and Mrs. Kirby as to how this statement was taken of Daisy Moore, and how this prosecution came about—you are familiar with it—without asking me any questions, detail to this jury how it came about. Mr. Albert Baskin: We object to all that as immaterial and hearsay matters that occurred outside of the presence of the defendant; secondary evidence on the proposition, they have introduced the best evidence—it would not be the best evidence, it is hearsay, and it was out of the presence of this defendant and he can not be bound by it. The court: Overrule the objection. Mr. Baskin: Note our exception. Mr. Wilson (testifying): Mrs. —, some lady, I do not know who it was at the time, phoned me one Sunday morning, the Sunday morning this girl made this statement, I should judge about eight o'clock, some time along there, I can not be certain, anyhow, I told her I would come—I did not really catch the name, but I did catch the number, and told me it was important, so having the number I went over there and finally found her, and then she told who they were—I did catch it was the granddaughter of J. R. Browning over there, people I know, so Mrs. Kirby told me what she had heard between Mrs. Fondren and the doctor, just about as related here to the jury and also the conversation she related occurring between herself and Mr. Fondren on that Friday. I did not remain there very long over an hour or so, about noon—she gave me the number, 812 Cherry Street. I went up to Mr. Baskin, the county attorney, who lived near where I was, and talked to him about the matter. Mr. Baskin: This objection goes to all of that. Mr. Wilson: And under his instructions I proceeded to the City Hall and got two detectives, Rufe Porter and Tom Snow, and instructed them to send Mrs. Hargrave down to that house. Q. And who else? A. I only instructed them; they sent Mrs. Hargrave down there, and Snow and Rufe Porter and myself went on down there. Mrs. Hargrave came after I got there. We walked in there and asked the lady some questions and finally I went into this room where Daisy Moore was sitting on the side of the bed and I sat down by her and asked her a few questions, who she was related to, and she told me, and then I asked her what was the matter with her, and she just hesitated and declined at first to answer any question, and then I told her, I said, 'Daisy, I know about an abortion having been committed on you.' Mr. Hood: We specially object to the details of any conversation that was had, as to what he did. The Court: I sustain the objection. The witness (Mr. Wilson): I told her, without stating who had told me.

Mr. Hood: We object to what he told her, if he got her and took her anywhere, that is different. The witness: What I knew at that time—not what I told her. I told her without telling her who told me what I know, what had been told me. Mr. Hood: Note our exception. We object to that, it was in the absence of the defendant and hearsay. Mr. Wilson: We understand you are making that objection to all of this. Mr. Baskin: And not waiving our objection to the whole of it? Mr. Wilson: Yes, sir. Mr. Baskin: Note our exception. The witness: I told her I wanted her to go ahead and tell me all the facts about this thing that happened at Fort Worth, and she sat there on the bed and refused for quite a while to say anything, would not make any reply. I insisted on her telling me about it, and the first word I believe she said— Mr. Hood: We object to anything she said. The court: I sustain the objection, don't give the details of any conversation. The witness: She finally, after insisting, she finally told me the facts. Mr. Shadle: We object to that. The court: I won't let him tell what the facts are. Mr. Shadle: I except. The witness: Finally told me about it, and Tom Snow and Mrs. Hargrave had gotten there by that time and were sitting there on the bedside, also these detectives were there; after she had told me this, I wrote a statement down about this affair here and she signed that statement, and after that was signed, I told her, I said, 'Daisy—' Mr. Hood: We object to any advice he gave her. Mr. Wilson: If the Kirbys did not do this thing, it would be an inference we did it. The purpose is not to connect the defendant with this offense. The court: On what she told you, did you act? Mr. Wilson: I want to state to the jury just how this statement was brought about; they are going to take the position Kirby did it. Q. Did she make a statement to you? A. Yes, sir. Q. Which she told you was the facts? A. That is for the jury to determine whether they are the facts. Q. And on which you acted? A. Yes, sir. Mr. Baskin: We object to that on the same ground. Mr. Wilson: The State wants this evidence limited. The court: I don't want to go into the evidence—tell what you did, if you know who started this prosecution, tell it. A. I am trying to tell what I did, if the court will indicate without stating what she said or I said? The court: Yes, sir. The witness: After this statement was signed, with reference to this matter here, then came up the question, I won't tell what was asked as to who was the father of the child, that naturally came up. Mr. Hood: We object to any statements made relative to the father of the child. The court: Yes, you can not tell that. Mr. Wilson: I can state she refused for quite a while to state and finally she broke down in tears like she did on this witness stand and said— Mr. Hood: We object to what she said. The witness: Told the story she has told you all, gentlemen of the jury, and on that we acted, the county attorney's office acted. Mr. Shadle: We move to exclude his answer there—she told the same story she told on the witness stand. The witness: I did not mean she told all. The court: I sustain the objection of the defendant and will exclude that from the jury. Gentlemen of the Jury: You will not consider for any purpose whatever

in this case the statement of Mr. Wilson made there about telling any story like she told here. Mr. Shadle: We still want our bill of exception. Mr. Wilson: With her statement, and I did not intend to say there she told all she has told in answer to the cross questions and direct questions like she did here. The court: Don't try to tell the substance any further, she made a story—she recited something to you? A. Yes, sir, on which this complaint was filed and this prosecution was commenced by the county attorney's office. Mrs. Hargrave, the matron, being there present at the time she made the statement, and Tom Snow and Rufe Porter hearing what was said. Mr. Baskin: They are detectives? A. Detectives of the city." The court in approving this bill did so with this explanation:

"The defense made it apparent that among their several defenses contention would be and was so argued by counsel that because of the supposed enmity between Geo. Kirby and the defendant, Kirbys had put the prosecuting witness up to charging the defendant with being the author of her shame and disgrace. The court permitted the assistant county attorney to show that the county attorney's department was responsible for the prosecution." Likewise, appellant accepted this bill as qualified, and, of course, is bound thereby.

Appellant contends, as a legal proposition and cites many cases to that effect, that the State can not prove by any witness that in his opinion an accused is guilty of the crime charged. Unquestionably, as a general rule, this is true. Based on this legal proposition appellant vigorously urges that the testimony of Mrs. Kirby, wherein she testified that her grandparents advised her to go back home and in the morning call up the prosecuting attorney's office, get Mr. Wilson, assistant prosecuting attorney, and tell them all about what happened,—tell them everything, is a statement by the Brownings that in their opinion appellant was guilty. We get no such meaning from this language or the circumstances shown by the evidence, or this bill, nor do we believe that the jury could have so understood, or gotten any such meaning out of it. Besides, it is perfectly clear from the whole record and this bill that both the State and the court were doing all they could to prevent any such illegal testimony being introduced and that they did so. Mr. Wilson, the State's attorney, specifically stating that this evidence "is not offered as any evidence tending to connect the defendant with the commission of this crime." We get clearly that the Brownings expressed no opinion whatever as to the guilt of anybody, nor that any crime had been committed, nor that, if a crime had been committed, what it was or who was guilty thereof. Evidently, from it, the Brownings did not know, and expressed no opinion that any crime whatever had been committed by anyone, nor by appellant, but were simply and solely telling the witness, in effect, not to institute any prosecution herself, but to lay the matter before the county attorney's department for their action.

Again, it will be noted that in the last bill above, the assistant county attorney expressly stated that his testimony was not for the purpose of connecting the defendant with the offense; that it was solely to meet

the defendant's attack of the said witnesses and to show that they and neither of them instituted this prosecution but that the county attorney's department solely did so. And he again expressly stated of Mrs. Kirby's statement to him, that he was not telling what she said as a fact, but "that is for the jury to determine whether they are facts." Again it is clear from the court's rulings, from time to time, on appellant's several objections, that he was making clear the purpose and the sole purpose for which said testimony was introduced; and in addition, he again expressly limited the use of it properly in his charge to the jury. We can not believe from this record that the jury made any improper use of this testimony, or considered it for any improper purpose, but that they solely considered it, which they had a right to do, to determine whether or not they believed the testimony of said witnesses as to the material facts, showing and tending to show this offense, or, as attacked by appellant, that the testimony of said respective witnesses was wholly false, fabricated, and that from a corrupt motive, as shown above.

We deem it unnecessary to further discuss the questions urged by appellant. The opinion is already much too lengthy, which is regretted. We are entirely and fully satisfied that no error was committed by the introduction of said testimony.

The motion for rehearing is overruled.

*Overruled.*

September 8, 1914.

DAVIDSON, Judge (dissenting).—I had not intended to elaborate my original dissent, or suggest further reasons why my brethren were and are in error in affirming the judgment, and in overruling the motion for rehearing, but counsel for appellant have furnished me with an argument on questions not fully discussed in original dissent so full, clear and unanswerable why my brethren are in error I am convinced that same should be perpetuated. I therefore adopt same as further reasons,—as part of my dissent,—why this judgment should be reversed, and I now adopt same, which is as follows:

"In the court below counsel representing appellant reserved and presented many complaints with reference to the actions and rulings of the trial court. These matters were all fully discussed in the brief filed in this court. The opinion of the court evidences that the court has given all of these matters considerable attention, and while all of them are brought forward and again urged by us in motion for rehearing, still we do not deem it necessary or even proper to undertake to discuss each of them in detail. In this connection we will state that we do not intend to discuss again at length the objections to the indictment. The matter is discussed so thoroughly in the dissenting opinion filed by Judge Davidson that we do not feel that we could add anything to what is there presented. There are, however, a few matters which were not presented at any great length in the original briefs, and with reference to which, we believe, after the most careful study and consideration of the case, that the trial court committed clear and injurious error

against the rights of this appellant. As we have said these matters were not stressed in the brief and are not discussed at any length or any authorities cited in the court's opinion. We therefore deem it proper in this written argument to discuss these matters at length in connection with the authorities that we think are applicable.

"The errors that we refer to relate in main to the action of the trial court with reference to the admission of the testimony of the witnesses Pansy Kirby, James Wilson and others, as shown by appellant's bill of exception duly reserved. We will consider this testimony in the following order: First, the testimony of Mrs. Kirby with reference to the conversation between her and her grandfather and grandmother. Second, her testimony with reference to the conversation between herself and the assistant county attorney. Third, the testimony of the assistant county attorney with reference to the conversation between himself and Mrs. Kirby. Fourth, the testimony of the assistant county attorney with reference to the conversation between himself and the prosecuting witness Daisy Moore. This testimony was all admitted by the trial court upon the theory that it was proper evidence tending to rebut the contention of appellant that the Kirbys had influenced the prosecuting witness to testify against him and had instigated the prosecution.

"First. It is clear to us that the trial court erred in admitting, over objection of defendant, the testimony of Mrs. Kirby with reference to the conversation between herself and her grandfather and grandmother, and in which they advised her, in effect, to go back to Fort Worth and have appellant prosecuted. This testimony was immaterial to any issue in the case; it involved a conversation and transaction had at a time and between parties when appellant was not present; it placed before the jury the advice of the grandfather and grandmother to have appellant prosecuted, and from this by fair, if not necessary, inference their opinion that he was guilty. It is conceded by counsel representing the State that all of this testimony was hearsay. It is, therefore, incumbent on the State to bring the testimony within one of the exceptions to the hearsay rule. It has not been brought within any of these exceptions. The mere fact that it was rebuttal testimony does not exempt it from the application of the well settled rule against the admission of hearsay. A party is no more entitled to rebut, than he is to support, a given issue with hearsay.

"The bill of exception concerning the admission of this conversation shows that the witness Pansy Kirby was the sister of the prosecuting witness Daisy Moore; and that she testified she met the defendant in Fort Worth on a certain Friday, and after having a conversation with him went over to see her sister Daisy, who was then at the home of a Mrs. Chancellor on Cherry Street in Fort Worth; and that after this she had a conversation with her husband with reference to reporting this matter to the officers; that she talked to her husband about reporting it, and that her husband told her, in effect, that she ought not to report the matter until she had seen her grandfather and grandmother;

that they were older than herself and knew more about such matters; that her husband had reference to her grandfather and grandmother, Mr. and Mrs. J. R. Browning, who lived at Weatherford, about thirty-two miles from Fort Worth. This part of the bill of exception is important for the reason that it shows that before seeing her grandfather and grandmother she had talked with her husband with reference to reporting appellant to the officers; and that he had advised her not to do this until she had gone over to Weatherford and talked the matter over with her grandfather and grandmother, and had received their advice. *This shows that she went to Weatherford to get their advice with reference to having appellant prosecuted, or at least with reference to reporting the affair to the officers.* After this introductory statement the bill then shows:

" 'Mr. Wilson (of counsel for the State) : Q. When you got over there and told Mr. Browning what had happened *did he give you advice about the matter?* A. Yes, sir. Mr. Shadle (of counsel for defendant) : We object to that about any advice he gave her up there about the matter, it is not binding upon the defendant and is wholly immaterial. Mr. Wilson: We think it is right for the State to show on whose advice she acted. Mr. Baskin (of counsel for defendant) : We except.—hearsay and a matter that occurred outside the presence of this defendant and he is not bound by it. Mr. Wilson: It is not offered as any evidence tending to connect the defendant with the commission of this crime. Mr. Baskin: We still object and except. Mr. Wilson: Q. Your grandpa Browning and your grandmother, have they got great grandchildren? A. Got one. Q. That is your child? A. Yes, sir. Q. Is Mr. Browning, J. R. Browning, the brother of Lieutenant Governor Browning, who lives in Amarillo? A. Yes, sir. Q. Is Mr. Browning the one you refer to as the father of your mother? A. Yes, sir. Q. When you reported this matter to him, I won't ask you in detail, *but did you tell him what you had heard and seen over here?* A. Tell grandpa? Q. Yes, ma'am. A. Yes, sir. Mr. Shadle: Our objection and exception goes to all of that. Mr. Wilson: Q. *What did he advise you?* A. He told me and my grandmother both— Q. *What did they advise you?* A. They told me "You go back home and in the morning you call up the prosecuting attorney's office," and I did, and I could not get anyone, and he told me if I could not get you at the office to call up your residence and look it up— Q. Who did he say get? A. He said get Mr. Wilson, Jim Wilson, and he said, "He is assistant prosecuting attorney there," and I done that next morning like they told me to; and he said, "You tell them all about what happened. Tell them to come to your house, 1211 Gould Avenue. Tell them everything when they get there." Q. Did you know I lived over here then? A. No, sir; I did not know you lived in Fort Worth. Q. Did you ask—*did you act on his advice in the matter?* A. Yes, sir. Q. Did you phone me? A. Yes, sir.'

"The witness then details how she made an appointment with Mr. Wilson, the assistant county attorney, and what occurred between them

at this appointment. This phase of the testimony we will discuss later. It is clear from what we have set out above that Mrs. Kirby first talked with her husband about the matter of having appellant reported to the officers, and her husband advised her before doing this to go to Weather- ford and get the advice of her grandfather and grandmother. The bill shows clearly, and the jury could not have otherwise understood the matter, that she went to Weatherford for the sole and only purpose of getting their advice with reference to this matter; and that she did receive their advice, which was that they take up the matter at once with the officers of the law; and, that she followed this advice. In other words, the bill shows as clearly as it could, that the grandfather and grandmother advised her to have appellant prosecuted or at least to place the facts before the prosecuting officers for their action. In this connection it should be held in mind that appellant married the daughter of Mr. and Mrs. Browning. The record further shows that he was their nephew. He was, therefore, related to them by both blood and marriage. They must have known that the disclosure of the facts with reference to the abortion as detailed by Mrs. Kirby to the officers of the law would result, not only in the prosecution of appellant, but in the disgrace of his wife, their daughter. Evidently, therefore, hav- ing these things in mind, and assuming, as the jury must have, that they had proper regard for the welfare of the family, it is difficult to see how an intelligent jury could have escaped the conclusion that, since these old people were willing to advise that all the facts be placed at once before the officers of the law for their action, they, therefore, thought appellant guilty. Evidently if they had believed the facts to be as they were detailed by appellant and Mrs. Fondren they would have seen no occasion for having the matter placed before the county attorney. The facts as detailed by Mrs. Kirby tended to show appel- lant's guilt, according to the view of the majority, and, therefore, it seems clear that when these facts were detailed to them, and on them they advised that the matter be taken up with the county attorney, they believed appellant guilty. Therefore it is clear that in placing the advice of these old people before the jury the State also, by necessary inference, got before the jury their opinion that appellant was guilty.

"It should be held in mind that this involved a transaction that hap- pened outside the presence of the defendant. We submit that the testi- mony was not only hearsay, and therefore not admissible, but was highly injurious and prejudicial in that the State was thus permitted to get before the jury the advice of these people with reference to appel- lant's guilt. As we understand the majority opinion, the position is taken that this testimony or conversation did not indicate the opinion of the grandfather and grandmother that appellant was guilty. We do not believe that this view of what the bill of exception shows is correct. Mrs. Kirby stated that she told them all that she had heard and seen in Fort Worth. Now, what she had heard and seen, at least as detailed by her, and under the law declared by the majority, pointed to the guilt of three persons and three persons only, namely: Dr. Link, Mrs. Fon-

dren, and the appellant, the first two as principals and appellant as accomplice. The facts, from the standpoint of Mrs. Kirby, pointed to the guilt of no other person. One who, on the facts as detailed by her, advised placing the whole matter before the prosecuting officers, must have understood that if her story was believed by the officers, these three persons, or at least some of them and no other persons would be prosecuted. Therefore, it seems clear that when the grandfather and grandmother, after being told by Mrs. Kirby what she had seen and heard at Fort Worth, advised her to place the whole matter before the prosecuting officers they must have believed her story, and believing it, must have believed Dr. Link, Mrs. Fondren and appellant guilty, No jury could have understood otherwise. Evidently the jury would have reason to believe that, in advising that the facts be placed before the officers, the old people must have known that someone might be prosecuted, and since the facts, as detailed by Mrs. Fondren, implicated Dr. Link, Mrs. Fondren and appellant and no one else, that they, therefore, in effect, advised the prosecution of these three persons, and having advised their prosecution must have been of the opinion they were guilty.

"The rule is general that the State will not be allowed in any criminal prosecution to place before the jury opinions directly or indirectly expressed with reference to the defendant's guilt. In many cases this court has announced and applied this well settled doctrine, and in many of them the opinion was less directly expressed than it is here.

"In the Bennett case, 39 Texas Crim. Rep., 639, it was held to be error to prove by an officer that he had used every effort to ferret out the perpetrator of the offense; and thus, by inference, get before the jury the officer's opinion that the defendant was guilty. This presented a less direct expression of opinion than is presented in the case at bar.

"The case of Denton v. State, 46 Texas Crim. Rep., 193, is in point. In that case the State in rebuttal placed Mason Cleveland, county attorney of Johnson County, on the stand and proved by him that the prosecuting witness was brought to his office on two different days and that she first refused to disclose the facts of the case and later that she did disclose the facts and divulge the name of the defendant, and he made a report thereof to the county attorney of Hill County. We quote as follows:

" 'The court explains the introduction of this testimony as follows: "That defendant on the cross-examination of the witness Pearl Thomas proved by her that she told of this act of intercourse with Denton to the county attorney of Johnson County, in Cleburne; that she first denied it. That on the second day they put her under oath, and she then admitted it; that she did not give defendant away until she was caught. In rebuttal the court permitted the State to place the county attorney for Johnson County on the stand and prove the facts stated in the bill. In this connection other testimony in the record showed that after the county attorney of Hill County received a phone message from Cleburne, attachments were issued for Pearl Thomas and her mother to

appear before the grand jury of Hill County. *All of this was permitted to disprove the theory of the defense that the prosecution had been* concocted out of a spirit of malice, and that Pearl Thomas voluntarily appeared before lawyers in Cleburne to institute prosecution; and that the jury was instructed that the testimony admitted could not be considered by the jury as any evidence of the guilt of the defendant." We can readily see that after appellant had proved by the witness Pearl Thomas, on cross-examination, the circumstances of the alleged rape, it would not injure appellant to prove the same circumstances by the witness Cleveland. But it does not occur to us that this authorized the State to prove by the witness Cleveland that he reported the matter to the county attorney of Hill County, and that he did so in order to have attachments issued for Pearl Thomas and her mother to appear before the grand jury of Hill County, so as to inaugurate and expedite the prosecution. This was an indirect way of getting before the jury the opinion of the county attorney of Johnson County as to the effect of the disclosures made by the witness Pearl Thomas to him. The fact that the court instructed the jury not to consider said testimony as any evidence of the guilt of defendant does not occur to us to have cured the vice of the admission of the testimony regarding the report of the county attorney of Johnson County to the county attorney of Hill County. If this testimony did not tend in some way to show the guilt of appellant, it is difficult to see how the jury could regard it for any purpose. And they would be liable to regard the fact that because, after Pearl Thomas disclosed to the county attorney of Johnson County the facts regarding the rape, he thereupon immediately instituted the prosecution through the county attorney of Hill County, that he believed the testimony of prosecutrix and it made out a case against appellant; that is, that such was his opinion, and it may have served to strengthen the evidence of the prosecutrix before the jury.'

"The case of Mercer v. State, 66 S. W. Rep., 555, also demonstrates that this testimony was inadmissible. In that case the State desired to show that one of its witnesses had acted in the capacity of a detective with reference to the prosecution involved. It appeared that this witness had gone into the 'joint business' at Burleson for the purpose of detecting appellant and another party. Over the objection of the defendant the witness was permitted to state and did state, that he engaged in the 'joint business' and was engaged as a detective by one Jim Ellis for the purpose of detecting parties suspected of crime in Burleson, including the defendant and one John McGee. The trial judge qualified the bill of exception by stating that the testimony was admitted for the purpose of showing the capacity in which the witness acted. This court held that while it was permissible to show that he acted in the capacity of a detective, still it was not permissible, in this connection, to show that he had been employed by Ellis to detect appellant, because this fact indicated the opinion of Ellis that appellant was guilty.

Vol. 74 Crim.-38.

"From Campbell v. State, 30 Texas Crim. App., 645, we quote: 'We are also of the opinion that the court erred in permitting the declarations, statements, and advice given by three parties, towit, his attorney, the district judge and the district attorney to the State's witness J. R. Hartman in regard to his testimony, these statements and advice being wholly irrelevant and not pertinent to the issues in the case. Such evidence was purely hearsay and calculated to prejudice the defendant in the minds of the jury by impressing upon them the opinion of the district judge and the district attorney as to the importance of his testimony, and the necessity that it should be concealed or withheld until the final trial of the defendant. McCracken v. State, 6 Texas Crim. App., 507; Chumley v. State, 20 Texas Crim. App., 547; Maines v. State, 23 Texas Crim. App., 568; Nalley v. State, 28 Texas Crim. App., 387.'

"And again it has been held in many cases that the State can not, in meeting some legitimate issue, incidentally place before the jury an opinion with reference to appellant's guilt. See Holloway v. State, 54 Texas Crim. Rep., 465; Barbee v. State, 50 Texas Crim. Rep., 426; Denton v. State, supra; Mercer v. State, supra; Cogdell v. State, 43 Texas Crim. Rep., 178; Morton v. State, 43 Texas Crim. Rep., 533; Jenkins v. State, 43 Texas Crim. Rep., 178; Watson v. State, 50 Texas Crim. Rep., 171. All hold that such testimony indicating an opinion with reference to the defendant's guilt is not admissible.

"It is further well established that, when such testimony has been gotten before the jury the court can not cure the error in admitting the testimony by undertaking to limit it in his charge. See Denton v. State, supra; Mercer v. State, supra; Parker v. State, 46 Texas Crim. Rep., 461; Cogdell v. State, supra.

"Nor does the fact that the prosecuting attorney stated that this testimony was not being introduced for the purpose of connecting the defendant with the offense, cure the error. We do not understand that a party can be allowed to get before the jury illegal and prejudicial testimony by merely stating that he does not intend to use it to establish his side of the case. The testimony indicated the advice of the aged people to have appellant prosecuted. By fair, if not necessary inference, it indicated their opinion that he was guilty. It was hearsay. No exception to the hearsay rule is pointed out justifying its admission, and the State was not entitled to get it before the jury by merely stating that it did not intend to use it to establish appellant's guilt.

"The testimony was further injurious and prejudicial in that it tended to bolster and sustain the story of the witness Pansy Kirby before the jury in an improper way. She testified that she told her grandfather and grandmother what she had heard and seen in Fort Worth with reference to this abortion, and they then advised her to go back home immediately and place all the facts before the assistant county attorney for his action. At that time they had not talked to any other member of the family. They had not heard Mrs. Fondren's version of the affair. They had not heard appellant's version. They knew nothing about it,

except what was told them by Mrs. Kirby, and on this, without further consultation with any member of the family, they were advising that the affair be at once placed before the prosecuting officers. Evidently the jury must have concluded that, knowing the several members of the family, they had great confidence in the truth of the story detailed by Mrs. Kirby, for on her story alone they were willing to drag the whole family into court in connection with the commission of a disgraceful offense.

"As we have said before, this conversation between Mrs. Kirby and her grandfather and grandmother and their advice to her is conceded to be hearsay. The learned counsel representing the State point out no exception to the hearsay rule justifying the admission of this testimony. They merely say that it was proper, in rebuttal of the contention of appellant, to introduce this hearsay.

"In addition to being hearsay the testimony was, as we have shown, highly injurious and prejudicial.

"In this connection it should be recalled that the appellant has *received the highest penalty* of the law applicable to the offense with which he was charged. The facts set out in the majority opinion show that there was at least a sharp issue with reference to his guilt. The testimony introduced by him tended to show that he had absolutely no connection with the abortion. The admission of this conversation between Mrs. Kirby and the grandfather and grandmother must have worked actual injury to the rights of appellant. This being true and the testimony being hearsay, the judgment should be reversed.

"Second. We further submit that the trial court erred in allowing the State to prove that Mrs. Kirby told the county attorney the same story she told the jury and will now discuss that point.

"After detailing her conversation between her grandfather and grandmother and her return to Fort Worth, and the fact that she had made an appointment with the assistant county attorney, Mrs. Kirby was then allowed to state, over objection, that the assistant county attorney came to her residence and had a conversation with her with reference to the abortion. We will quote so much of the bill as is applicable to what we shall now discuss:

" 'Mr. Wilson: Q. Did you phone me and talk to me? A. Yes, sir. I done like they told me. I told them "This is Pansy Kirby, J. R. Browning's granddaughter," and I told you I wanted you to come to my house, 1211 Gould Avenue. Q. Did you tell me what it was about? A. I told you I had some important news to tell you—I didn't tell you what it was. Q. When I got there it was on Sunday? A. Yes, sir. Q. Did you tell me what you have testified here? A. Yes, sir.'

"In this connection another bill of exception shows that while the witness James C. Wilson, assistant county attorney of Tarrant County, was on the stand he was allowed to testify with reference to this conversation with Mrs. Kirby as follows:

" 'Mrs. ——, some lady, I didn't know who it was at the time; phoned me one Sunday, the Sunday morning this girl made this statement, I

should judge about 8 o'clock, some time along there, I can not be certain. Anyhow, I told her I would come—I didn't really catch the name, I did catch the number, told me it was important, so having the number I went over there and finally found her, and then she told me who they were—I did catch, was the granddaughter of J. R. Browning over there, people I had known. *So Mrs. Kirby told me what she had heard between Mrs.* Fondren and the doctor just about as related here to the jury, and also the conversation she related occurring between herself and Mrs. Fondren on that Friday.' This testimony was admitted over appellant's objection that the same was hearsay and involved a transaction and conversation had outside the presence of defendant and which could not bind him.

"It should be recalled, in this connection, that no basis whatever had been laid for the introduction of this testimony undertaking to sustain Mrs. Kirby by proving that she had told the same story out of court that she was telling in court. The defendant had not, and did not at any time during the trial, introduce any of her statements made out of court contradictory to her testimony on the stand. It is true that the defendant introduced testimony tending to show that for a long time she and her husband had disliked him, and had for many years entertained ill-will toward him and had introduced the statements of her husband tending to show a desire for revenge. These matters are all fully set out in the majority opinion. As said in the majority opinion, appellant contended that the testimony of Daisy Moore was induced and inspired by Kirby and wife from their corrupt motive, hostility to and hatred of him, and their, or Mr. Kirby's threats, against him of vengeance. However, this ill-will and desire for revenge had existed for many years and *existed at the time these statements were made as well as at the time of the trial.* It is true the authorities cited in the majority opinion establish the rule that, where it is contended that a witness is testifying to a certain state of facts, and that his testimony has been influenced or induced by some corrupt motive, his statements made before the existence and operation of such a motive on his mind in harmony with his testimony on the trial are admissible to sustain him. These cases, however, hold, and the rule is general that a statement made by the witness *after the motive to falsify exists* is not admissible to sustain his testimony on the trial. Therefore, the authorities cited in the majority opinion, as well as many others, show that Mrs. Kirby's testimony and the testimony of the county attorney to the effect that she told him the same story of this affair that she was telling the jury was clearly inadmissible. Let it be conceded that, as shown by the majority opinion, appellant contended that Mrs. Kirby's activity and testimony was caused by her ill-will toward him and desire for revenge. If this is the motive that induced her to testify as she did, then this motive had existed for many years and existed at the time she talked with Wilson; and under well settled principles her statements made out of court at a time when the same motive to falsify existed, as at the time of the trial were not admissible to sustain her.

See the cases cited in the majority opinion all announcing this rule, and also the following:   Sanders v. State, 31 Texas Crim. Rep., 525; Conway v. State, 33 Texas Crim. Rep., 327; Anderson v. State, 50 Texas Crim. Rep., 134.

"Mr. Branch, in section 875 of his work, states the rule as follows: 'Where the testimony of State's witness is impeached on the ground of corrupt influence or falsification, it is error to sustain the witness by proof of statements in harmony with his testimony *made after the motive existed which would likely prompt him to testify falsely.'*

"This well settled rule thus clearly stated demonstrates that Mrs. Kirby's testimony and the testimony of the witness Wilson that she had told the same story to him she had told the jury was not admissible. Moreover, the quotation made in the majority opinion from the case of Jones v. State, fully establishes that her testimony was not admissible, for in that case it is clearly recognized both in the original and in the opinion on rehearing that where the alleged statement is made at a time when the same motive to falsify existed that exists at the time of the trial, the statement is not admissible.   This rule applies squarely to the testimony of Mrs. Kirby.   She was influenced at the time she talked to the county attorney by exactly the same motives to make a false statement that were charged against her at the time of the trial.

"It may be that, under this record, and under the well settled rule discussed in the Jones case and other decisions referred to in the majority opinion on motion for rehearing, it was permissible for the State to prove that the prosecuting witness Daisy Moore had told the assistant county attorney, in a conference with him, the same story she was telling the jury.   There can be no doubt that the rule laid down in Jones v. State, 38 Texas Crim. Rep., 87, and in Mitchell v. State, 36 Texas Crim. Rep., 278, is a sound and well established rule.   The only question that can arise is with reference to its application to this record. We submit (and will hereafter discuss this phase of the bills of exception) that the testimony that Daisy Moore told the county attorney the same story she told the jury was not admissible for the reason that two days before her conference with him Mrs. Kirby had gone to see her and had at least had an opportunity to talk with her with reference to the affair.   In this connection it should be recalled that appellant contended that her testimony had been influenced improperly by the Kirbys. This being true and it appearing at the time that she made the statement to the county attorney she had already had a conference with Mrs. Kirby we do not believe his testimony with reference to what she told him was admissible.   We will discuss this later.   However, if this be a doubtful question on account of the state of record, it is undoubtedly true that, under this record, the testimony of Wilson and Mrs. Kirby to the effect that Mrs. Kirby had told him the same story she was telling the jury was not admissible.   In fact, we believe that the very cases cited in the majority opinion establish conclusively that this testimony was not admissible.

"In the case of Jones v. State, 38 Texas Crim. Rep., 103, the appel-

lant was prosecuted for murder. He contended that some years before the deceased had raped his wife. We quote: 'The statement of facts presents but one issue and that, whether the appellant was guilty of murder in killing W. G. Veal or whether he was guilty of manslaughter. If the jury believed the testimony of Mrs. Jones and appellant the theory of appellant that it is nothing greater than manslaughter is clearly presented. If the jury did not believe the testimony of appellant and Mrs. Jones, then manslaughter so far as the jury is concerned is not in the case. The State's theory is that the killing was not prompted by the passion aroused by this misconduct of Veal towards Mrs. Jones, wife of appellant, but that her testimony was manufactured to aid her husband in his defense.' In other words, the State contended in that case that the story of Mrs. Jones on the witness stand that some years before the deceased, Veal, had raped her was a fabrication invented to save the life or liberty of her husband. In this state of the record and in view of this contention of the State this court held it proper for the defendant to introduce testimony that *before* the defendant had killed deceased, Mrs. Jones had told the same story with reference to being raped by the deceased that she had told at the trial. This declaration was admitted for the reason that at the time the same was made she could not have been influenced by the motive to falsify charged against her at the time of the trial.

"Again in the case of Mitchell v. State, referred to in the majority opinion, the same ruling was made. In that case it having been contended that a given witness had testified falsely in order to secure the dismissal of a case pending against him it was held proper to introduce his statements in harmony with his testimony made before his case was dismissed.

"The same is true of Akin v. State, 56 Texas Crim. Rep., 324, referred to by the majority. In that case it having been contended by the State that the testimony of defendant's wife with reference to deceased insulting her was a fabrication to save her husband, it was held admissible for the defendant to show that *before* the homicide she had made statements with reference to the matter in harmony with her testimony at this trial.

"See also Wigmore on Evidence, section 1128, where the learned writer correctly states the general rule, stressing the idea that the statement must be made at a time prior to the existence of the fact indicating bias, interest, or corruption.

"Now in this case at the time Mrs. Kirby had her conference with the county attorney the crime charged against defendant had been committed. Mrs. Kirby then knew all about the circumstances surrounding its commission that she knew at the time of the trial. Her conference with the county attorney in which, according to her testimony and to his testimony, she told him the same story she had told the jury, was a week after the alleged crime was committed. It was two days after Mrs. Kirby had her last conversation with appellant, according to her testimony. At that time, and years before, according to appellant's contention, Mrs. Kirby and her husband had been very hostile toward

him. He had opposed their marriage and when, after having separated, they attempted to go back together he bitterly opposed that step. Her husband had expressed, according to appellant's witnesses, a desire for revenge on appellant. It was the theory of appellant that actuated by this long continued hostility and feeling and desire for revenge the Kirbys had instigated this prosecution against him. Now, this being true and this charge having been laid at the door of the Kirbys, was it permissible for Mrs. Kirby to introduce, in support of her testimony, her declarations made out of court in harmony with her testimony on the trial, at a time when the same motive to falsify existed? Clearly not. At the time she talked to the county attorney she was influenced by the same motives and influences to testify falsely against appellant that could have influenced her at the time of the trial. If appellant had committed any crime it had been committed some time before her conference with the county attorney, and if her testimony against him was influenced or induced by her hostility and desire for revenge, then her story to the county attorney was influenced and induced by the same motives or causes. Therefore, under the rule laid down in the above cited cases, this testimony was not admissible. The rule is settled that, it is never proper, in support of a witness who is charged with having testified under some corrupt motive or influence, to introduce the statements of the witness made out of court at a time when the same alleged corrupt motive or influence existed. This is recognized in all the cases cited in the majority opinion, and is expressly declared in the Sanders case and in the Conway case, above referred to. See decision by Judge Hurt in last mentioned case.

"The question now arises, was the admission of this testimony injurious to appellant? In determining this it should be recalled that the State's case rested, as stated in the majority opinion, on the testimony of Daisy Moore and Pansy Kirby. Mrs. Kirby testified to the agreement between Mrs. Fondren and the doctor to have the abortion produced. She further testified to two conversations with appellant after the abortion had been produced. In both of these conversations, as detailed by her, he indicated a guilty knowledge of and a guilty connection with the affair. In the second conversation and the one with reference to which Mr. Wilson was allowed to testify that Mrs. Kirby told him the same thing she told the jury, appellant, according to Mrs. Kirby, practically confessed to her that he had been having illicit intercourse with Daisy Moore. She charged him with this fact and he not only did not deny it, but told her that it was none of her 'darned business.' The whole conversation is set out in the majority opinion, and clearly was one of the most incriminating circumstances introduced against appellant. He denied both of these conversations. They are attested by no witness other than Mrs. Kirby. He further explains himself, and through his other witnesses, in a satisfactory way, his presence in Fort Worth as having nothing whatever to do with the abortion, and the testimony of Mrs. Kirby was the only testimony tending to show that his presence in Fort Worth had any connection with

the crime. Therefore it is clear that the error of the court in permitting the State to prove that Mrs. Kirby had told the county attorney the same story she told the jury was highly prejudicial. Further discussion of this point, we believe, is unnecessary. It is clear to us that, under this record, and the authorities cited in the majority opinion and cited by us, reversible error was committed in admitting this testimony.

"Third. We next refer to the testimony of the witness James Wilson with reference to his first conversation with the prosecuting witness Daisy Moore. We do not deem it necessary, however, to discuss this part of the bill of exception at length. The majority has determined that since the defendant contended that the testimony of Daisy Moore was false and was inspired and influenced by Mrs. Kirby and her husband, and that they in turn were moved and actuated by their long continued hostility to appellant, it was permissible for the State to show that before the operation of the influence of the Kirbys Daisy Moore had told a story to the county attorney similar to that detailed to the jury. Authorities are cited in the majority opinion holding that, where the testimony of a witness is assailed and it is asserted that the same is false and the result of some corrupt motive or influence, statements of the witness made out of court at a time before the existence of such influence are admissible to sustain him. This was the holding in Jones v. State, which is quoted from at length in the majority opinion. With that holding we have no disagreement. Applying the rules laid down in that case and the other cases referred to it is clear to us that the testimony of Mrs. Kirby, which we have before discussed, was not admissible.

"Now with reference to the witness Daisy Moore, the record does not show that the statement made by her to the county attorney was made *before* the existence of the influence of the Kirbys over her. The record shows, and it is recited in one of these bills of exception, that on Friday before the county attorney had this conversation with Daisy Moore, Mrs. Kirby had gone over to see her at the home of a Mrs. Chancelor. What occurred between her and Mrs. Kirby on this occasion is not shown. Her statement to the county attorney was made two days after this conference with Mrs. Kirby, and, therefore, it can not be said that the statement was made before the Kirbys had had an opportunity to influence her with reference to her testimony. On the contrary the record shows, as above stated, that her conference with the county attorney was two days after Mrs. Kirby had had a conference with her. We, therefore, submit that under these circumstances the testimony of the assistant county attorney, in effect, that she told him the story that she had told the jury was not admissible, for it was not shown to be a statement made at a time before she could have been influenced by the Kirbys. The appellant contended that her testimony was caused and induced by the influence of the Kirbys. This being true her statements in harmony with her testimony on the trial made at a time before she could have been influenced by the Kirbys with reference to her story would have been admissible. But the statement made to the county

attorney does not come within this class, and, therefore, the rule laid down in Jones v. State does not apply. See Sanders v. State, 31 Texas Crim. Rep., 525; Conway v. State, 33 Texas Crim. Rep., 327; Anderson v. State, 50 Texas Crim. Rep., 134; Millsaps v. State, 42 S. W. Rep., 991.

"However, even if there should be any doubt with reference to the admissibility of the testimony of the county attorney with reference to his conversation with the witness Daisy Moore it is clear that the testimony of Mrs. Kirby with reference to the conversation between herself and her grandfather and grandmother, and between herself and the county attorney, and the testimony of that official with reference to his conversation with her was not admissible. And the error of the court with reference to this testimony being clearly reversible, we do not feel it necessary to discuss the testimony to the witness Wilson with reference to his conversation with Daisy Moore at length. The other bills clearly disclose reversible error.

"The instruction of the court limiting all of this testimony to use for a particular purpose was wholly unavailing. See Denton and Mercer cases hereinbefore discussed. The testimony of Mrs. Kirby with reference to her conversation with her grandfather and grandmother and their advice to take up the matter with the officers was not admissible for any purpose, but was irrelevant to any issue in the case; it shed no light whatever on the issue with reference to the guilt of appellant; it merely informed the jury that the grandfather and grandmother had advised his prosecution. This fact was not only immaterial, but could under no view of the record have become material. We do not understand how the fact that some person had advised this prosecution could under any possible state of the record have become admissible against the defendant. Again, the testimony of Mrs. Kirby and that of the witness Wilson with reference to a conversation with him was wholly inadmissible for any purpose as we believe we have shown, and being admissible for no purpose it could not be properly limited to any particular purpose. The fact that Mrs. Kirby told consistent stories about the affair did not in anywise tend to show that she instituted the prosecution in good faith or that in her activity against appellant she was not actuated by ill-will or revenge. In fact, if she was actuated by these motives it is more than likely that her statements being preconceived and the result of deliberation would be consistent. It was perfectly proper for the State to introduce testimony tending to show the fact, if it was a fact, that Mrs. Kirby and her husband had not talked to the witness Daisy Moore with reference to her testimony. The State might have also shown on this issue that the Kirbys were not unfriendly toward appellant. They might have further proven by the county attorney that he instituted the prosecution independently of any statement made to him by the Kirbys. But on this issue it was not permissible for the State to prove that Mrs. Kirby had told consistent stories with reference to the affair. This did not tend in anywise to exculpate her from the charge laid at her door by appellant.

"We therefore submit that the trial court allowed the State entirely

too much scope in meeting this issue.   Even if appellant did charge the Kirbys with instigating this prosecution and with influencing the prosecuting witness Daisy Moore, they were not entitled to exculpate themselves from the charge by the use of hearsay testimony any more than appellant was entitled, with hearsay, to exculpate himself from the charge in the indictment.   The court should have confined the Kirbys, in meeting the charge made against them by appellant, to the use of proper and legitimate testimony.   They were not entitled to undertake to meet this charge with hearsay.

"Fourth.   Aside from the matters before discussed, appellant has brought forward and again presented in his motion for rehearing all the questions originally presented in his motion for new trial in the lower court.   There is one of these matters that we believe discloses reversible error and will briefly discuss.

"The tenth, eleventh, twelfth, thirteenth and fourteenth assignments of error assign error on the action of the trial court in permitting the State, over objection of defendant, to prove by various witnesses the general reputation of the prosecuting witness, Daisy Moore, in the community where she lived with reference to being a moral, chaste and pure girl.   It is held by the majority that this testimony was admissible upon the ground that appellant in making out his defense had assailed the virtue and chastity of the prosecuting witness.   It is true that appellant's wife testified that her daughter Daisy had told her at the time she told her of her state of pregnancy that she had had intercourse with several and did not know who was responsible for her condition.   It is true also that in this connection various members of the family testified to her staying out late at night.   No evidence was introduced, however, to the effect that her general reputation for virtue, chastity or morality was bad and no question to that effect was asked.   In fact, appellant himself testified, on cross-examination, that her reputation was good in these respects and that he had always considered her a pure and moral girl.   Appellant objected to the admission of this testimony on the ground that he had made no effort whatever to assail her reputation in the respects inquired about, and that the same had been in nowise put in issue.

"In this connection it should be recalled that the State contended that appellant and appellant alone was responsible for the ruin of Daisy Moore.   The State introduced testimony to this effect as tending to show motive on the part of appellant for the abortion.   Appellant denied not only having anything to do with the abortion, but also denied the motive, namely: denied having had intercourse at any time with the prosecuting witness. To meet this issue and to disprove the contention of the State that he was responsible for the pregnancy of the witness Daisy Moore, appellant introduced the testimony of his wife that Daisy Moore had stated to her that she had had intercourse with several persons.   This testimony also served to contradict and traverse the testimony of Daisy Moore that she had had intercourse with no person other than appellant.   This was purely defensive testimony and

the mere fact that it incidentally tended to show that the witness Daisy Moore was unchaste and not virtuous did not authorize the introduction of testimony of her general reputation in rebuttal. We quote the following from Gregory v. State, 94 S. W. Rep., 1043:

" 'We understand the doctrine now to be established, before evidence of general reputation as to some characteristic of a deceased person can be offered by the State, this matter must be first put in issue by the defendant by offering testimony of that reputation. It is not sufficient merely that because of the defendant's testimony concerning the homicide some characteristic of deceased may be brought out or made to appear. In this case appellant offered positive testimony to the effect that deceased had debauched the wife of appellant, which would indicate that he was not a person of good character for virtue. But this did not justify the State, in order to meet this, to resort to evidence of the general reputation of deceased as to virtue and chastity. The State could not thus meet this proof by positive evidence with proof of general reputation, and would be only authorized to introduce evidence of general reputation of the deceased in the respect offered, when appellant himself had first assailed the State's case by proof of deceased's general reputation. Graves v. State, 14 Texas Crim. App., 113; McCandless v. State, 57 S. W. Rep., 672, 42 Texas Crim. Rep., 58; Kennedy v. State (Ala.), 37 So. Rep., 90.'

"Other authorities might be cited, but is deemed unnecessary. Appellant was entitled to traverse the testimony of the State that he and he alone had had intercourse with the witness Daisy Moore. He was also entitled to traverse the testimony of the State that he and he alone was responsible for her pregnancy. The mere fact that his defensive testimony on these issues tended to show that she was unchaste and not virtuous did not authorize introduction of testimony on the part of the State that her general reputation for these characteristics was good.

"We think this case comes squarely within the rules discussed in the Gregory case. See also Wakefield v. State, 50 Texas Crim. Rep., 124, 94 S. W. Rep., 1046; Welch v. State, 50 Texas Crim. Rep., 28, 95 S. W. Rep., 1035; Richardson v. State, 44 Texas Crim. Rep., 211, 70 S. W. Rep., 320.

"We note the reference in the majority opinion to the case of Bullock v. State, 73 Texas Crim. Rep., 419, 156 S. W. Rep., 196. We do not understand that that case necessarily involved any question similar to the one here presented. There may be language in the opinion broad enough to render this testimony admissible, but we do not believe that it was necessarily called for by the facts before the court and that the force of the decision should be confined to the facts and issues before the court."